# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 5696 | **DATE** | 4/17/2000 |
| **CASE TITLE** | Steadfast Insurance Co.,Inc. vs. Auto Marketing Network,etal | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: We grant Imperial's motion for summary judgment (101-1) in part and find that Imperial is not liable for any of Steadfast's losses arising from its payments to AMN for defaulted loans. However, because we find that there is still a question of fact about Imperial's actions with regard to AMN's finances, we deny summary judgment to the extent that Imperial seeks to be shielded from liability for manipulating AMN's finances.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | APR 2 0 2000 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | docketing deputy initials | 134 |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | 4/17/2000 | |
| | | | | date mailed notice | |
| GL | courtroom deputy's initials | | | GL | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STEADFAST INSURANCE CO., INC.,    )
                                    )
          Plaintiff,         )
                                      )
         v.             )      97 C 5696
                                      )
AUTO MARKETING NETWORK, INC. and    )
IMPERIAL CREDIT INDUSTRIES, INC.,    )
                                      )
         Defendants.      )

## MEMORANDUM OPINION AND ORDER



MARVIN E. ASPEN, Chief Judge:

Defendant Imperial Credit Industries, Inc. (Imperial), the parent company of

defendant Auto Marketing Network, Inc. (AMN), has moved for summary judgment, asking

this Court to find that it is not liable – under an alter-ego theory – for the allegedly

fraudulent activity of AMN. Plaintiff Steadfast Insurance Co., Inc. (Steadfast) contends that

Imperial's actions with regard to AMN at the very least raise issues of material fact about

whether it is appropriate to pierce Imperial's corporate veil. We have considered the

parties' briefs and are now ready to make our decision.

## BACKGROUND[1]

Steadfast is a wholly-owned subsidiary of Zurich Insurance Company and is in the

business of selling insurance. In March 1993, Steadfast issued a so-called "Motor Vehicle

Collateral Enhancement Policy" ("the Policy") to AMN, a company which had recently been

formed for the purpose of purchasing, pooling, and selling automobile loans originating

---

[1] The following facts are undisputed except where noted and are taken from the parties'
Rule 56 statements of material fact.

134

from credit-impaired borrowers. Although the parties dispute the specific motivation behind the Policy, they agree that it served to protect AMN against losses from defaults on the loans AMN originated and sold in the secondary market. The term of the Policy was extended several times, and eventually covered all loans that AMN originated from November 1, 1992 to May 1, 1994, a total of 5,238 loans. A majority of the Steadfast-insured AMN loans were pooled together and then sold to a company called Daiwa Securities America, Inc.; these loans came to be known as the "Daiwa Pool".

Most of the loans were for terms of three-to-five years. A separate company called LSI Financial Services, Inc. (LSI) serviced each loan during its term[2] and filed claims with Steadfast on defaulted loans, although the parties dispute the amount of autonomy LSI had to file such claims without AMN's approval.

During the term of the Policy, both in June and October of 1993 and in January of 1994, Steadfast conducted audits of AMN's loan files for the purpose of, among others, monitoring AMN's compliance with its own underwriting guidelines when it issued loans. These audits concluded generally that the quality of AMN's credit decisions was very good. Also in January of 1994, Daiwa hired independent auditor Baker and Associates to audit the loans it had purchased. This audit found that 71% of AMN's loans were issued according to its underwriting guidelines and that this percentage was unsatisfactory.[3]

---

[2] "Servicing" refers to activities such as attempting to collect delinquent payments, repossessing automobiles, and generally administering the insurance claims filed under the Policy.

[3] Imperial contends that two later Baker and Associates audits of the Daiwa loans found that AMN's underwriting practices were satisfactory and showed much higher adherence to underwriting guidelines. However, Steadfast contends – and a review of these two audits confirms – that the audits were not of the Daiwa loans insured by Steadfast, but were of different pools of loans issued by AMN that are not relevant to this action.

2

In late spring of 1994, several disputes arose between Steadfast and AMN with regard to the Policy. The disputed issues concerned such things as whether an endorsement to the Policy had been forged, wrongly changing the rate of interest to be charged on the loans from 10% to 13.5%; whether AMN had wrongly cancelled several primary insurance policies which would have covered default claims instead of Steadfast; and other matters regarding the Policy that are not relevant to this case. In order to try to resolve the disputes, the parties hired counsel and eventually negotiated a draft settlement agreement intended to resolve all matters in exchange for a payment by AMN to Steadfast, set-off by monies Steadfast owed AMN. Under the agreement, Steadfast had the right to audit AMN and LSI in order to determine the settlement amount under the agreement[4] as well as to determine generally AMN's compliance with the Policy. Steadfast audited LSI in the fall of 1996 and audited AMN in the spring of 1997, but the settlement agreement was never executed.

In late 1996, Imperial began to investigate AMN with the idea of possibly purchasing the company. Imperial conducted due diligence of AMN in early spring 1997. As part of its due diligence, Imperial received copies of the AMN-Steadfast draft settlement agreement, the Policy, and the 1993 and 1994 audits of AMN by Steadfast and Baker. Imperial also knew -- from a meeting on unrelated matters it attended with Steadfast's parent, Zurich Insurance Co. -- that by February 1997, Steadfast had lost $8-10 million on the Policy. Imperial's due diligence reports of AMN make such observations as: "AMN

---

[4] The parties dispute the total amount that AMN could owe Steadfast under the agreement, Imperial contending that the agreement called for a $75,000 payment, and Steadfast arguing that the settlement amount is $215,000. Neither party explains its calculation.

historically has not had a stellar reputation. Over the last 18 months or so, AMN has made significant strides in improving their reputation and tightening their underwriting criteria." Imperial also noted in its due diligence reports that "up until very recently . . . the company has been mismanaged in many ways . . . The company's early portfolio of loans, on which they experienced significant losses, also reflects poorly on management." In addition to these observations, Imperial also noted that "if we can assume that the company's earlier mistakes can be attributed to 'growing pains' and are clearly behind them," and if AMN continued to improve its operations, it could be a profitable acquisition for Imperial, which was interested in getting involved in the sub-prime auto lending business.

In the spring of 1997, Imperial acquired AMN in a stock purchase. The parties agree that at the time of the acquisition, AMN was insolvent and needed a cash infusion of $11.4 million from Imperial in order to continue operating. Prior to that time, Imperial had provided nearly $50 million to AMN in an attempt to maintain its operations and help it meet its obligations. Approximately $20 million of this amount was provided through a non-secured loan with an interest rate of 12%; the rest was classified as "inter-company payables" and appeared on the companies' balance sheets, but was not subject to any specific repayment plan. In order to give AMN a positive net worth for the purpose of completing a loan securitization, Imperial's board of directors agreed to convert part of AMN's inter-company payables from debt to equity.[5] In March 1998, Imperial requested

---

[5] In August of 1999, Imperial obtained an affidavit from Darren Graeler, chief financial officer of AMN and assistant controller at Imperial. The affidavit states that AMN owes Imperial a total of over $50 million as a result of inter-company loans. However, Graeler provided another affidavit in November of 1999 which states that part of AMN's inter-company loans had been reclassified as an equity infusion in order to make AMN solvent, and that this money had never been reclassified as a loan, *i.e.*, it was not subject to repayment.

4

that AMN repay $1.4 million of its outstanding debt because it had excess funds on its balance sheet.

In the fall of 1997, Steadfast sued AMN and Imperial, charging AMN with common law and statutory fraud, and breach of contract.[6] Under the theory that Imperial is AMN's alter-ego, Steadfast seeks to hold Imperial liable for all of the losses Steadfast alleges it suffered due to AMN's faulty underwriting.[7]

## ANALYSIS

Imperial argues that it cannot be liable for AMN's alleged bad acts because the undisputed facts establish that under California law,[8] it is not AMN's alter-ego. Generally, the mere fact of a parent-subsidiary relationship does not render the parent liable for the tortious acts of its subsidiary. *See Las Palmas Assoc. v. Las Palmas Center Assoc.*, 1 Cal. Rptr.2d 301, 319 (Cal. Ct. App. 1991). California law holds that two criteria must be met before the courts will pierce a corporate veil. First, "there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and second, it must be found that "if the acts are treated as those of the

---

[6] Specifically, Steadfast alleges that AMN induced Steadfast into issuing the Policy by misrepresenting that it would adhere to particular underwriting guidelines, and then approved the submission of claims for defaulted loans to Steadfast even though AMN knew that the loans had not been issued in compliance with its guidelines. Steadfast also alleges that AMN engaged in other fraudulent activity with regard to submission of the claims, such as forging a false policy endorsement that raised the interest rate charged to Steadfast and failing to maintain primary insurance which would have paid some of the claims instead of Steadfast.

[7] Steadfast testified at the hearing on its motion for a preliminary injunction that it seeks damages for all of the claims it paid out, regardless of whether the underlying loan was issued in conformity with AMN's underwriting guidelines.

[8] The parties agree that California law governs the substantive issues in this case because Imperial is a California corporation.

[subsidiary] alone, an inequitable result with follow." *Associated Vendors, Inc. v. Oakland Meat Co.*, 26 Cal.Rptr. 806, 812 (Cal. Ct. App. 1962), *citing Automotriz etc. De California S.A. v. Resnick*, 47 Cal.2d 792, 796; 306 P.2d 1 (1957). Further, both of these requirements must coexist before the corporate form will be disregarded. *See Associated Vendors*, 26 Cal.Rptr. at 813, 815. In many cases, the facts showing unity of interest and the facts establishing inequity merge; that is, the parent totally controls the subsidiary's actions and directs it to commit unlawful acts so that it is only fair to hold the parent responsible.

The court in *Associated Vendors* set forth an extensive list of factors pertinent to determining whether there is a unity of interest such that a corporate veil should be pierced. These factors include, but are not limited to: commingling of funds among and between entities; failure to segregate the funds of different entities; the unauthorized diversion of corporate assets to non-corporate uses or the treatment of corporate assets as belonging to an individual shareholder; identical equitable ownership in the two entities; the use of a corporation as a mere shell or instrumentality for a single venture; the disregard of legal formalities between the entities; the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; the failure to maintain minutes or other adequate corporate records; and the failure to adequately capitalize the subsidiary or the subsidiary's total absence of corporate assets. *Id.* at 813-815. The *Associated Vendors* court also observed that "bad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity." *Id.* at

6

813.  Put another way, the inequity sought to be eliminated by piercing the corporate veil "must be that of the party against whom the doctrine is invoked, and such party must have been an actor in the course of conduct constituting the 'abuse of the corporate privilege.'" *United States Fire Ins. Co., v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 165 Cal.Rptr. 726, 736 (Cal. Ct. App. 1980) (citing *Roman Catholic Archbishop v. Superior Court,* 93 Cal.Rptr. 338, 341 (1971)).

Although the decision of whether to pierce a corporate veil is generally a question of fact, courts have been willing to grant or deny summary judgment on the issue in certain cases. *See, e.g., Ruggiero v. AMN, Corp.,* C 94-20160 JW, 1995 WL 549010 (N.D. Cal., Sept. 12, 1995) (granting summary judgment and refusing to pierce corporate veil); *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurstt v. Louisiana Hydrolec,* 854 F.2d 1538, 1543 (9th Cir. 1988) (granting summary judgment and agreeing to pierce corporate veil). The decision to pierce a corporate veil is dependent on the specific facts and circumstances of each case; there is no "litmus test" for piercing. *See Mid-Century Ins. Co. v. Gardner,* 11 Cal.Rptr.2d 918, 922 (Cal. Ct. App. 1992).

In order to grant summary judgment for Imperial, we must make all inferences in favor of Steadfast and find that the undisputed facts show that either one, or both, of the veil-piercing criteria do not exist.  Imperial argues that summary judgment is appropriate because the material facts show that AMN and Imperial do not enjoy a unity of interest such that AMN is a mere instrumentality of Imperial, and because there would be no inequity if we refuse to pierce Imperial's veil.  To make this determination, we must consider how each of the facts bear upon the two veil-piercing criteria.

7

Complicating our analysis is the fact that most of the cases cited by the parties –

indeed, most of the cases dealing with California's alter-ego law – involve circumstances

different from those presented here. For example, a number of the cases involve piercing

a corporate veil to reach sole shareholders or small groups of insiders who are accused

of creating or using a corporate entity in order to shield themselves from liability for

fraudulent actions. *See, e.g., Alexander v. Abbey of the Chimes*, 163 Cal.Rptr. 377

(Cal. Ct. App. 1980); *Riddle v. Leuschner*, 51 Cal.2d 574 (1959); *United States v.

Healthwin-Midtown Convalescent Hosp. and Rehab. Ctr., Inc.*, 511 F. Supp. 416 (C.D. Cal.,

1981). And most of the cases also address piercing a veil to reach a parent which

controlled the subsidiary at the time the unlawful conduct occurred. *See, e.g., Abbey*, 163

Cal.Rptr. at 380 (court pierced veil to reach sole shareholder who controlled company

during time it refused to pay debt and litigated against creditor); *American States Ins. Co.

v. Crawly Constr., Inc.*, 134 F.3d 376 (9th Cir. 1998) (unpub.) (court held sole shareholder

liable for corporation's debts where individual was sole shareholder and officer for nearly

all of corporation's existence).

A.      *Questions of Inequity*

Steadfast argues that, at the least, there is a question of fact about whether it would

be inequitable to refuse to pierce Imperial's corporate veil. As evidence of such inequity,

Steadfast contends that Imperial knew of AMN's alleged fraud before it acquired the

company, that Imperial continued defrauding Steadfast after the acquisition by submitting

insurance claims to Steadfast, and that Imperial manipulated AMN's assets for its own

benefit and to the detriment of AMN's creditors. Before we examine each allegation, we

8

observe that Steadfast cannot create a factual dispute merely by contending that Imperial must have known about AMN's alleged fraud. Instead, it needs to set forth specific factual evidence showing that there is a genuine issue for trial; mere unsupported allegations will not suffice to defeat summary judgment. *See United Assoc. of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261,1265 (7th Cir. 1990).

1.    Imperial's Knowledge of AMN's Alleged Fraud Prior to Acquisition

Steadfast contends that Imperial must have known about Steadfast's dispute with AMN regarding AMN's failure to adhere to its underwriting guidelines and its other allegedly fraudulent actions.[9]   The facts Steadfast contends demonstrates such knowledge are: 1) the audit reports; 2) the draft settlement agreement; 3) Imperial's recognition of AMN's management problems; and 4) discussions between Imperial and Steadfast's parent (Zurich) about AMN.  As we explain below, Steadfast's allegations do not cast doubt on Imperial's insistence that it was unaware of Steadfast's fraud allegations at the time it acquired AMN.

First, the three Steadfast audit reports and the Baker & Associates report show, at most, that one outside auditor believed AMN's underwriting of the Daiwa Portfolio was unsatisfactory because 29% of the sample files the auditor reviewed did not adhere to AMN's underwriting criteria. In contrast, all three of the Steadfast audits concluded that AMN was originating quality loans. Steadfast now argues that its internal audits were completed early in the term of the Policy, before any loans had defaulted, and that these

---

[9] The gist of Steadfast's argument with regard to this issue is that Imperial knew about the alleged fraud, but acquired AMN anyway because Imperial believed it could never be held liable for AMN's earlier actions.

reports represent the views of only one employee of Steadfast, not the entire company. However, neither of these after-the-fact arguments have any bearing on Imperial's knowledge of AMN's allegedly fraudulent actions.[10] Even if we infer that Imperial knew AMN practiced arguably poor underwriting, there is no evidence equating any such knowledge of management problems to knowledge of fraud.

Similarly, the draft settlement agreement contains no mention of Steadfast's concerns about AMN's underwriting, and the parties have pointed us to no such reference. Instead, the agreement resolves the parties' so-called "disputed issues" by stating, *inter alia,* that: 1) the interest rate to be charged on all future loans would be 13.5%;[11] 2) Steadfast is not liable for paying claims where the debtor defaults before making a single payment; and 3) Steadfast recognizes that AMN does not have primary insurance. Steadfast insists (without explanation or support) that the agreement provides for AMN to pay at least $215,000 to settle the parties' disputes, nearly 1/3 the price that Imperial paid for AMN. But even assuming that the cost to AMN to settle the parties' disputes was as high as $215,000 – an amount we were not able to substantiate by reviewing the agreement – Steadfast cites to no evidence demonstrating that the settlement's terms or amount should have put Imperial on notice that Steadfast was preparing to file a $23 million lawsuit against AMN based in large part on Steadfast's losses from AMN's

---

[10] Indeed, by arguing that Steadfast's own audits were too early to demonstrate any problems with AMN, Steadfast implicitly recognizes the difficulty in measuring compliance with underwriting standards merely by looking at the underwriting files. That is, contrary to Steadfast's arguments, Imperial could not have known by a "cursory review of the Daiwa Loan files that they failed to meet AMN's Underwriting Criteria." (Steadfast response at footnote 5).

[11] Although Steadfast contends that the 13.5% rate was set pursuant to a forged endorsement to the Policy, neither party explains this accusation further.

alleged faulty underwriting. To the contrary, there is evidence that the agreement reassured Imperial that all disputes between AMN and Steadfast would be resolved with a single payment of no more than several hundred thousand dollars.[12]

Finally, it is undisputed that Imperial knew about AMN's management problems and knew that Steadfast had paid out between $8-10 million on the Policy. Imperial recognized that it would have to monitor AMN carefully in the future, particularly with regard to AMN's adherence to its underwriting guidelines. However, Steadfast provides no evidence which would allow us to make the leap it proposes: that Imperial's knowledge of AMN's problems raises a question about whether Imperial also knew that Steadfast believed AMN had committed fraud and breached its contract. Such a finding is especially unwarranted given the limited terms of the settlement agreement and Steadfast's own admission that it was unaware of AMN's alleged underwriting violations until *after* Imperial purchased AMN, when Steadfast completed an audit of AMN in March of 1997.[13] (Steadfast resp. to Imperial's Rule 56 statement, ¶ 23).

In summary, the evidence does not support Steadfast's contention that at the time of the acquisition in March of 1997, Imperial knew of the facts on which Steadfast's allegations against AMN are based.

---

[12] No inference of knowledge can by gleaned from the agreement's provision that Steadfast had the right to audit LSI and AMN both to set the settlement amount and to determine AMN's compliance with the Policy. There is no evidence that AMN failed to comply with the Policy other than with respect to matters being settled by the agreement.

[13] Although Steadfast insists that Imperial must have learned "material facts supporting Steadfast's claims, even before Steadfast did," it simultaneously faults Imperial's due diligence for failing to question Steadfast prior to the acquisition about Steadfast's losses on the Policy or AMN's performance.

2. Imperial's Continuation of AMN's Business After Acquisition

Steadfast next contends that after acquiring AMN, Imperial actively participated in defrauding Steadfast by allowing AMN to submit insurance claims for defaulted loans: 1) that Imperial knew had been issued in violation of AMN's underwriting guidelines; 2) that were based on the wrong interest rate; and 3) that were not protected by primary insurance. It is these actions, Steadfast contends, which make it inequitable for this Court to refuse to pierce Imperial's corporate veil.

The problem with Steadfast's argument is that even if the above allegations are true, Imperial's actions can be found fraudulent under California law only if Steadfast relied upon them to its detriment. *See Agriculture Ins. Co. v. Superior Court*, 82 Cal.Rptr.2d 594, 604 (Cal. Ct. App. 1999). Steadfast claims only that Imperial participated in AMN's alleged fraud by allowing AMN to continue filing claims, not that Steadfast continued to rely on the accuracy of AMN claims filed after the acquisition, or even that it paid such claims.[14]

It is undisputed that both the forged Policy endorsement setting the wrong interest rate and AMN's cancellation of its primary insurance were raised in the draft settlement agreement negotiated by AMN and Steadfast prior to Imperial's acquisition of AMN. The agreement set the future interest rate at 13.5% and included a recognition by Steadfast that AMN did not have primary insurance. Although the agreement was never executed, Steadfast cannot now claim that it was unaware that subsequent claims might include the higher interest rate or that there was still no primary insurance. Further, because we do not know how Steadfast treated claims filed after the draft settlement (*i.e.*, whether

_____

[14] Approximately 16% of all claims for the defaulted Daiwa Pool loans were filed *after* the acquisition.

12

Steadfast paid the claims or disputed them to Imperial, or took some other action), we cannot make any inference that Imperial submitted claims that it knew should have been paid by primary insurance or which contained the wrong interest rate.[15]

Nor do we have any information as to whether Imperial knowingly allowed AMN to submit claims to Steadfast for defaulted loans issued in contravention of AMN's underwriting guidelines or whether Steadfast relied on such submissions to its detriment.[16] Neither party submits evidence about how AMN/Imperial filed claims, whether Steadfast paid such claims, or whether Steadfast disputed some or all of the claims between the time of Imperial's acquisition of AMN in March of 1997 and Steadfast's lawsuit, filed in August of 1997. We do not know exactly when Steadfast began to suspect AMN, but Steadfast received the results of an audit of AMN's underwriting files in March of 1997 (detailing defaulted claims filed prior to Imperial's acquisition), and by early June of 1997 Steadfast was working with outside counsel to draft a complaint against AMN and Imperial. Even making all reasonable inferences in Steadfast's favor, and finding that Imperial must have known that 29% of the Daiwa loans AMN had originated did not adhere to its own underwriting criteria, we cannot reasonably make the inference that Imperial's submission

---

[15] In fact, the only evidence we have about the parties' behavior is a statement in the LSI audit that during the course of the interest rate dispute, Steadfast continued to calculate its claim payments at the 10% rate, which demonstrates that Steadfast did not rely upon -- or pay -- claims at the higher rate.

[16] Imperial contends that it could never be liable for the submission of fraudulent claims because an independent third party, LSI, was totally responsible for filing claims on defaulted loans with Steadfast. Although it is not material to our result, we note that there is evidence that AMN exercised some control over LSI, at least with respect to approving claims LSI sought to file, so we do not rest our decision on Imperial's contention that neither it nor AMN had any input into the filing of claims with Steadfast.

13

of insurance claims between March and June of 1997 amounted to fraud.[17] There is simply no evidence of this. In any event, Steadfast cannot claim to have relied on any claims submitted after it began preparing its lawsuit.1

For these reasons, we find there to be no question of fact casting doubt on Imperial's contention that it did not perpetuate any alleged fraud by allowing AMN to submit insurance claims to Steadfast after Imperial acquired AMN. Because we do not find that the equities require us to pierce Imperial's corporate veil and hold it liable for Steadfast's losses from its payment of allegedly fraudulent insurance claims, we do not need to address the other veil piercing factor, that of "unity of interest." We therefore grant partial summary judgment to Imperial, to the extent that Steadfast seeks damages for losses it incurred from paying claims on defaulted loans.[18] However, Steadfast's final contention – that Imperial manipulated AMN's assets to the detriment of Steadfast and other creditors – raises more difficult questions that implicate both prongs of the veil-piercing test, and it is to these questions that we now turn.

B. *Evidence of Unity of Interest and Inequity With Regard to Imperial's Control of AMN's Finances*

Steadfast claims that Imperial sought to strip AMN of its assets and its ability to earn revenue in order to unlawfully gain a benefit from AMN to the detriment of Steadfast and

---

[17] We know that from March of 1997 through September of 1999, AMN/Imperial filed claims for approximately 325 defaulted loans. We have no estimate of how many of these loans Steadfast believes were issued in violation of AMN's underwriting policies or how many were filed between Imperial's acquisition and the filing of the lawsuit.

[18] As we noted above, Steadfast seeks to recover all of the money it paid out in claims, whether the defaulted loan was correctly underwritten or not.

other creditors. Although Steadfast's allegations in this regard raise a number of questions about Imperial's conduct, the question of whether there is enough evidence to deny summary judgment is a tricky one, because – as Imperial reminds us throughout its brief – it had nothing to do with AMN's underwriting or loan origination, and in order pierce a corporate veil, "the fraud or inequity sought to be eliminated must be that of the party against whom the alter ego doctrine is invoked." *American Home Ins. Co.*, 175 Cal.Rptr. at 843. We have already determined that there is no evidence to link Imperial to Steadfast's accusations against AMN regarding alleged underwriting fraud and claim submission. Unlike most veil-piercing cases, Imperial neither participated in AMN's allegedly fraudulent underwriting nor created AMN in order to hide some unlawful activity by Imperial. The mere fact that AMN might be unable to satisfy a judgment rendered against it does not justify piercing Imperial's corporate veil.[19] "It is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced." *Associated Vendors*, 26 Cal.Rptr. at 816. As Imperial points out, Steadfast would be in the same position it is now – trying to litigate against an insolvent company – had Imperial never acquired AMN. The critical question is whether the facts might support holding Imperial responsible for abusing AMN's corporate form after it acquired AMN and became aware of Steadfast's charges, by stripping AMN of its assets and possibly leaving AMN in worse financial shape than it was in before the acquisition.

---

[19] Steadfast is not a creditor at this point, as it has obtained no judgment against AMN, and its injunction preventing Imperial from depleting AMN's assets was dissolved in accordance with the Supreme Court's decision in *Grupo Mexicano de Desarrillo, S.A. v. Alliance Bond Fund, Inc.*, 119 S. Ct. 1961 (1999).

We conclude that Steadfast has alleged facts sufficient to raise a dispute about whether it would be proper to pierce Imperial's corporate veil to hold it responsible for manipulating AMN's assets. In doing so, we are careful to distinguish the alleged wrong here – Imperial's manipulation of AMN's finances – from the alleged fraud by AMN for which we found Imperial not liable above.[20]

Steadfast alleges facts suggesting the presence of both the unity of interest and the inequity prongs of the veil-piercing test. The material facts are these: 1) Imperial adjusted its representations of AMN's available assets at various times during the litigation;[21] 2) during this litigation, Imperial reclassified certain loans to AMN as capital infusions, but continued to count them as loans to be repaid; 3) Imperial has demanded and obtained repayment from AMN for certain loans, although it is not apparent whether AMN is solvent; and 4) certain of Imperial's inter-company payables, or "loans" to AMN were not formally

---

[20] Rather, in this case "[t]he issue is not so much whether, for all purposes, the corporation is the alter ego of its stockholders or officers, nor whether the very purpose of the organization of the corporation was to defraud the individual who is now in court complaining, as it is an issue of whether in the particular case presented and for the purposes of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form." *Mesler v. Bragg Management Co.*, 216 Cal.Rptr. 443, 449 (1985). We appreciate Imperial's argument that its manipulation of AMN's assets was merely a failed attempt to make the company solvent enough to continue its operations, and we make no determination about whether Imperial is entitled to try to recoup some of the monies it infused into AMN. Our holding today merely recognizes that there is enough of a factual question about Imperial's motivations in this regard to deny summary judgment at this point.

[21] Specifically, there is a question of fact about the extent to which AMN would be able to pay a money judgment to Steadfast if found liable, and the nature and amount of its assets. The parties disagree about representations made to Magistrate Schenkier during the hearing on Steadfast's motion for a preliminary injunction, and none of the materials submitted adequately clarify the issue.

memorialized, although Imperial contends that AMN is liable to repay them.[22]  Under California law, the presence of these types of factors can support piercing the corporate veil in certain situations.  *See American States Ins.. Co. v. Crawley Construction, Inc.,* 134 F.3d 376; *Nilsson, Robbins,* 854 F.2d at 1543-44.  Although the cited cases have somewhat different factual scenarios from the instant case, there are enough similarities to the situation here to make their reasoning applicable, and we have enough doubts about Imperial's motives so that we cannot grant summary judgment for Imperial on this issue.

## CONCLUSION

For the foregoing reasons, we grant Imperial's motion for summary judgment in part and find that Imperial is not liable for any of Steadfast's losses arising from its payments to AMN for defaulted loans.  However, because we find that there is still a question of fact about Imperial's actions with regard to AMN's finances, we deny summary judgment to the extent that Imperial seeks to be shielded from liability for manipulating AMN's finances.

It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated_____4/17/2000_____

---

[22] We disagree with Steadfast's characterization of some of the other facts that it contends support unity of interest or inequity.  For example, the evidence does not show that Imperial forced AMN to cut its loan origination from a high of $30 million per month to $3 million per month in order to destroy AMN's chances to earn revenues, but that Imperial instituted tighter underwriting guidelines that had this effect.