# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 5696 | **DATE** | 7/31/2001 |
| **CASE TITLE** | Steadfast Insurance Co., Inc. vs. Auto Marketing Network, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Motion of plaintiff for summary judgment [164-1] is denied. Motion of defendant Imperial Credit Industries, Inc. for summary judgment [157-1] is denied. Plaintiff's motion to exclude testimony of Stephen Diamond and Steven Lubet [164-2] is granted. Status hearing is set for 8/30/01 at 9:30 a.m. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | | **Document Number** |
|---|---|---|---|---|---|---|---|
| | No notices required. | | | | 4 | | |
| ✓ | Notices mailed by judge's staff. | | | | number of notices | | |
| | Notified counsel by telephone. | | | | AUG 0 2 2001 | | |
| | Docketing to mail notices. | | | | date docketed | | 192 |
| | Mail AO 450 form. | | | | | | |
| | Copy to judge/magistrate judge. | | | | 8/1/2001 | | |
| | | | | | date mailed notice | | |
| MD | courtroom deputy's initials | | | | MD | | |
| | | | | | mailing deputy initials | | |

FILED FOR DOCKETING
01 AUG -1 PM 3: 44

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| STEADFAST INSURANCE CO., INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) 97 C 5696 |
| | ) |
| v. | ) |
| | ) |
| AUTO MARKETING NETWORK, INC. and | ) |
| IMPERIAL CREDIT INDUSTRIES, INC., | ) |
| | ) |
| Defendants. | ) |

DOCKETED

AUG 2 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff Steadfast Insurance ("Steadfast") filed suit against Auto Marketing Network, Inc. ("AMN") and its successor, Imperial Credit Industries, Inc. ("Imperial"), contending, among other things, Illinois common law and civil statutory insurance fraud, 720 ILCS §46-5(a),[1] and breach of contract based on AMN's alleged failure to adhere to the terms of an insurance contract entered into between the parties and AMN's wrongful issuance of subprime loans covered by the contract. In response, Imperial filed a counterclaim alleging that Steadfast had filed the complaint against Imperial in bad faith, in violation of 720 ILCS 5/46-5(b).[2] This decision concerns Imperial's counterclaim. Imperial and Steadfast have cross-moved for summary judgment. For the reasons articulated below, the court denies both motions.

### SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

---

[1] Article 46 of the Criminal Code of 1961, as amended, effective January 1, 1993, imposes criminal sanctions for insurance fraud and fraud on the government. Section 46-5(a), in addition, provides civil penalties against the perpetrators of such fraud.

[2] Section (b) appears to be the obverse of (a) in that it also permits civil penalties against an insurance company who seeks civil penalties under (a) in "bad faith."

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS

The facts underlying Steadfast's claims against AMN have been set forth in the opinion concerning Steadfast's motion for summary judgment on the principal complaint against AMN, to be issued in conjunction with this opinion.[3] The facts pertinent to the pending motions relate to whether Imperial as the owner of AMN is liable to Steadfast for AMN's alleged misdeeds

---

[3]Contemporaneous with this opinion, this court has denied Steadfast's motion for summary judgment against AMN but narrowed and framed the triable issues. Specifically, this court has found that although AMN was required to adhere to its own guidelines when determining whether certain loan applicants were entitled to loans in order to be covered by the insurance policy entered into between Steadfast and AMN, either certain guidelines are ambiguous or unambiguous guidelines or criteria within the guidelines create fact issues regarding AMN's guideline application. *See Steadfast Ins. Co., Inc.* v. *Auto Marketing Network, Inc.*, No. 97 C 5696 (N.D. Ill. July 31, 2001).

2

(Steadfast's complaint against Imperial) and whether Steadfast made that claim against Imperial in bad faith (the counterclaim addressed by the pending cross motions for summary judgment). With regard to Imperial's counterclaim against Steadfast, unless otherwise stated, the following facts are undisputed.

*Imperial's Acquisition of AMN*

On March 14, 1997, Imperial acquired all of AMN's outstanding stock for $750,000. AMN was insolvent at the time of the acquisition.[4] At the same time, Imperial lent AMN approximately $8 million primarily to repay AMN's outstanding indebtedness on a working line of credit extended by Greenwich Capital Markets, Inc. Imperial also lent AMN $3.5 million to fund AMN's daily operations. The $11.5 million in loans was memorialized by a $20 million unsecured note that required repayment only if AMN had cash available and only if AMN had issued preferred stock to Imperial in an amount greater than the outstanding principal balance. (As of January 31, 1999, Imperial had advanced $19,574,789.52 to AMN under this note. As of March 1999, none of that principal had been repaid and no preferred stock had been issued. According to the note, Imperial has no recourse for non-payment against any of AMN's assets.[5]

Imperial conditioned the acquisition's closing on AMN's existing management executing

---

[4]Although Steadfast does not appear to dispute AMN's insolvency at the time of the acquisition, it has presented evidence that Imperial may have inconsistently contended that AMN was insolvent and solvent depending on the situation. Steadfast cites deposition testimony of Imperial's assistant comptroller Darren Graeler, where he testified that AMN's finances were reclassified to show a positive net worth during negotiations with a third-party regarding certain securitizations, as the third-party had required, and compares this testimony with Graeler's Declaration, where he states that AMN was insolvent.

[5]Steadfast also presented evidence that Imperial lent AMN over $24 million in inter-company payables so that AMN could meet its daily obligations, but no new agreement was executed to govern these loans and no agreement exists obligating AMN to repay these funds. The parties agree that Imperial infused AMN with over $50 million and that AMN has only repaid approximately one and a half million dollars. AMN repaid $1.4 million to Imperial in April 1998, approximately three months after Steadfast filed its second amended complaint.

new employee contracts that mirrored Imperial's standardized employment contract. Imperial also required that AMN terminate its consulting agreement with Pat Ghere, AMN's co-founder, and that all directors (except Stephen Raskin, then president of AMN, and Patricia Daly, then executive vice president of AMN) resign from the board of directors.

*Pre-Acquisition Activities*

The parties agree that prior to the acquisition, Steadfast and AMN had entered into settlement negotiations regarding a number of disputes (claims under the insurance contract, presumably) and agree that a tentative settlement was made contingent on Steadfast auditing AMN. The parties disagree as to whether these disputes were minor or significant and the amount of money AMN was required to pay to settle the disputes. The settlement agreement was never consummated.[6]

Also prior to the acquisition, Imperial conducted a due diligence investigation of AMN and two other corporations involved in the sub-prime automobile industry that Imperial was also

---

[6]Chief Judge Aspen, previously found the following with regard to the draft settlement agreement:

. . . [T]he draft settlement agreement contains no mention of Steadfast's concerns about AMN's underwriting, and the parties have pointed us to no such reference. Instead, the agreement resolves the parties' so-called "disputed issues" by stating, *inter alia*, that: 1) the interest rate to be charged on all future loans would be 13.5%; 2) Steadfast is not liable for paying claims where the debtor defaults before making a single payment; and 3) Steadfast recognizes that AMN does not have primary insurance. Steadfast insists (without explanation or support) that the agreement provides for AMN to pay at least $215,000 to settle - an amount we were not able to substantiate by reviewing the agreement - Steadfast cites no evidence demonstrating that the settlement's terms or amount should have put Imperial on notice that Steadfast was preparing to file a $23 million lawsuit against AMN based in large part on Steadfast's losses from AMN's alleged faulty underwriting. To the contrary, there is evidence that the agreement reassured Imperial that all disputes between AMN and Steadfast would be resolved with a single payment of no more than several thousand dollars.

*Steadfast*, No. 97 C 5696, at 10-11 (N.D. Ill. Apr. 17, 2000) (footnotes omitted).

considering acquiring. During its due diligence investigation of AMN, Imperial became concerned about Greenwich's relationship with AMN because Greenwich had extended AMN approximately $7 million pursuant to a working capital line of credit and locked AMN into a long-term financing program that required AMN to sell at a steep discount to Greenwich essentially every loan that AMN originated. Moreover, Greenwich retained the right to sell AMN in the event AMN defaulted on its obligations under the working capital line of credit. Imperial also discovered during its investigation that many of the tens of thousands of loans AMN had originated had been pooled into a number of "securitizations" of varying degrees of maturity, some of which the parties refer to as the "Daiwa Pool."[7]

On March 12, 1997, John Upshar, an Imperial employee, wrote to Daniel Rood, Imperial's senior vice president of corporate financing, that the due diligence investigation revealed, in addition to various other "pluses" and "minuses," that AMN had "been mismanaged in many ways," and "[t]he company's early portfolio of loans, on which they experienced significant losses, also reflects poorly on management as does the significant 'baggage' we encountered upon arrival." (Steadfast Ex. 21 at 5.)[8] Upshar testified at his deposition that when Steadfast's parent company, Zurich American Insurance Co. ("Zurich"), became aware that Imperial was investigating AMN, Zurich representatives alluded to Upshar that Zurich "had either lost or were going to lose $8 to $10 million on something to do with insurance on one of their securitizations" but Upshar also testified that he "didn't then understand what all of that was

_____

[7]The parties dispute whether the loans included in the Daiwa Pool were almost fully matured at the time of the acquisition.

[8]As noted by Imperial, however, Chief Judge Aspen's April 17, 2000 opinion specifically rejected Steadfast's contention that Imperial knew of AMN's alleged fraud at the time it acquired AMN.

about." (Steadfast Ex. 24 at 53.)

*Post-Acquisition Activities*

After the acquisition, Imperial senior management received regular reports monitoring AMN's performance, and Imperial hired a company called Cygnet to take over many of AMN's loan servicing functions. In addition, although disputed by Imperial, AMN employee Neal Corn testified at his deposition that after the acquisition Imperial installed a management team at AMN comprised of Rood, Terry Durham, and Upshar, and that these individual's became involved in AMN's day-to-day functions. Corn also stated that "[t]he underwriting became much more critical, and [the Imperial management team] had told me they wanted to basically dry up what we were doing as far as approvals while they went in and evaluated what we've done in the past to come up with new policies." (Steadfast Ex. 23 at 20.) Although Raskin was still AMN's president after the takeover, Corn stated that he understood Imperial, and not Raskin, to be in control after the acquisition. Raskin resigned in October 1997. Contrary to Corn's statements, Imperial contends that Raskin continued to manage AMN after the acquisition and until his departure. Following Raskin's departure, Imperial asserts, Upshur headed a management team from Imperial until Ben Goff was hired as AMN's new Chief Executive Officer in February, 1998, whereupon Upshar's temporary management team was disbanded.

Moreover, while the parties dispute whether Imperial caused AMN to replace its employee benefit programs, there appears to be no dispute that such programs were replaced by those afforded by Imperial, and that all AMN employees received Imperial's employee handbook. Imperial also filed joint tax returns and consolidated financial statements on behalf of AMN. And although the parties dispute whether Imperial assumed control over AMN's finances

upon acquisition, they agree that, at times, Imperial would directly wire transfer funds to third parties to pay for AMN's expenses and that Imperial took over AMN's payroll and human resources functions. Further, Imperial also renegotiated AMN's warehouse agreement with Greenwich, signed the agreement, guaranteed some of AMN's obligations to Greenwich, which included financial as well as servicing obligations, and agreed to repay Greenwich for advances made to AMN before the acquisition.

*AMN's Demise*

Prior to the acquisition, AMN had originated approximately $20 million a month in loans. That amount increased to $30 million a month during the months following the acquisition but then decreased to between $1 and $3 million a month. Rood testified that the decrease was the result of changes made to loan origination procedures and policies. In August 1998, Imperial discontinued AMN's operations and announced its plans to sell all of AMN's assets within the year.

*Steadfast's Investigative and Complaint-Filing Activities*

Within days of Imperial's acquisition of AMN, Steadfast and its outside counsel, Schulte, Roth & Zabel, LLP ("SRZ"), began investigating Imperial's background and the nature of the acquisition. Moreover, on March 23, 1997, Darnley D. Stewart at SRZ sent two Steadfast representatives, David Siesko and Steven Bauer,[9] a newspaper article regarding a lawsuit filed against Imperial alleging that Imperial had sold the plaintiff in that suit "an unprofitable operation, propped up only by illegal kickbacks paid to independent brokers for mortgage

---

[9] Both Siesko and Bauer are attorneys employed by Zurich, and Siesko is Bauer's superior. Imperial states that Bauer was in charge of the litigation against AMN and Imperial.

applications." (AMN Ex. 16.) Stewart also wrote to Siesko and Bauer that "it seems the apple won't be falling far from the tree." (*Id.* (emphasis in original.)) Bauer testified at his deposition, however, that he gave Stewart's comment little or no weight at the time.

On April 16, 1997, while Steadfast continued to investigate Imperial and the acquisition, SRZ circulated a draft complaint against AMN that contained no mention of Imperial. Steadfast and SRZ circulated a second draft complaint on June 11, 1997, after investigating Imperial and the circumstances of Imperial's acquisition of AMN. This draft complaint included Imperial in the caption as a defendant and alleged (beyond jurisdictional facts) only that Imperial acquired AMN in a stock purchase transaction. SRZ transmitted a final draft complaint to Bauer on August 1, 1997, which included the same allegations about Imperial as in the first draft but, for the first time, mentioned Imperial in the introductory prayer for relief.[10]

Steadfast filed its first complaint in this court on August 12, 1997. This complaint again names Imperial in the caption, contains the same jurisdictional and background information stated in the final draft complaint, and mentions Imperial in the introductory prayer for relief. Imperial asserts that this complaint along with all of the previous drafts fails to contain substantive allegations against Imperial, and Steadfast argues that its detailed allegations of AMN's fraud coupled with the allegation that Imperial acquired AMN amount to substantive allegations against Imperial. It is undisputed, however, that Imperial is specifically mentioned only as stated above. The bulk of the filed complaint contains allegations regarding AMN's

---

[10]The court notes that although Steadfast does not dispute Imperial's description of the draft complaints (except to disagree with Imperial's contention that the draft complaints' allegations do not amount to substantive allegations against Imperial), the parties only provided the court with completely redacted versions of these documents.

alleged fraud and breach of contract.

The parties dispute whether Steadfast served the complaint on either AMN or Imperial and further dispute whether AMN was aware of the lawsuit when AMN's representatives and Siesko, Bauer, and SRZ attorney Howard Epstein met at AMN's Tulsa, Oklahoma office on September 23, 1997. Imperial contends that AMN believed the meeting was called to execute the above-described settlement agreement, but at the meeting Imperial quickly became aware that Steadfast called the meeting to disclose the lawsuit. Siesko testified at his deposition, however, that Steadfast attended the meeting "with an intent to try and resolve the issues between" AMN and Steadfast. (Steadfast Ex. 9 at 123.) The parties agree that a copy of the complaint was given to AMN's representatives and that the meeting was very short and ended abruptly.

On October 9, 1997, Imperial's counsel wrote to SRZ and urged them to dismiss the complaint as being filed in bad faith. Steadfast amended its initial complaint on October 27, 1997. In addition to the facts alleged in the prior complaint regarding Imperial, the amended complaint alleged in the facts section applicable to all counts the following:

> 78. Upon information and belief, during the course of disclosures made by AMN to Imperial Credit, and as a result of the due diligence investigation conducted by Imperial Credit, leading up to the acquisition – Imperial Credit gained actual or constructive knowledge of the dispute between AMN and Steadfast, and of AMN's historical and ongoing fraudulent concealment and material breaches, including, without limitation, the foregoing reservation of rights letter and the substance thereof.

> 79. Upon information and belief, Imperial Credit, despite having gained such knowledge completed its acquisition of AMN and ratified AMN's wrongful conduct and breach, and to date has permitted AMN to continue such wrongful conduct and breach.

(Steadfast Ex. 4.) Moreover, all four counts allege damage as a result of Imperial's ratification of

AMN's wrongful conduct and Imperial's failure to stop such conduct. On November 18, 1997, Imperial's counsel again wrote to SRZ requesting that Steadfast voluntarily dismiss its complaint as being filed in bad faith. On February 6, 1998, Chief Judge Aspen granted Steadfast leave to file a second amended complaint, and Steadfast filed that complaint on January 29, 1998. This complaint alleges, *inter alia*, that Imperial was aware of AMN's wrongful conduct at the time of the acquisition or shortly thereafter, and ratified such conduct by benefitting from it and allowing it to continue. "As such," the complaint continues, "Imperial became liable for AMN's conduct even though it was not a conspirator with AMN at the time AMN's scheme was hatched and implemented." (Steadfast Ex. 5. ¶ 78.) The complaint also alleged that Imperial "exclusively dominates and pervasively controls the business affairs of its wholly owned subsidiary," and that "AMN has effectively merged with Imperial affecting [*sic*] a de facto merger." (*Id.* ¶¶ 79 and 88.)[11]

When asked at his deposition why the allegations in the second amended complaint contained different or more specific allegations against Imperial than the original or amended complaints, Bauer responded that "the factual basis [sic] are the same," that he didn't know why the more specific allegations weren't stated earlier, and that he didn't "recall specifically" whether he had in his possession or had knowledge of the facts contained in the second amended complaint when the amended complaint was filed. (Imperial Ex. 20, at 131-32.) Bauer also testified that he decided not to drop Imperial from the lawsuit after receiving Imperial's correspondence because he believed "the letter was incorrect in its conclusions," "there were

---

[11]Specifically, this complaint contains a section entitled "Imperial's Involvement in AMN's Wrongful Conduct And Its Pervasive Control Over AMN's Operations" that sets forth 15 paragraphs of allegations. (*See id.* ¶¶ 78 through 92.)

good reasons to bring the lawsuit against Imperial," and the "letter inaccurately characterized our lawsuit as not having a basis, as intentional abuse of the legal process." (Steadfast Ex. 8, at 139-42.) Moreover, Bauer denied that Imperial was named as a defendant because of AMN's inability to satisfy any judgment.

On April 22, 1998, Chief Judge Aspen denied Imperial's motion to dismiss the second amended complaint for failure to state a claim upon which may be granted and ruled that Steadfast had sufficiently pled "alter ego" liability. *See Steadfast Ins. Co., Inc.* v. *Auto Marketing Network, Inc.*, 2 F. Supp. 2d 1058 (N.D. Ill. 1998). In April, 2000, Chief Judge Aspen granted in part Imperial's motion for summary judgment on the second amended complaint, concluding, *inter alia*, that no fact question existed "casting doubt on Imperial's contention that it did not perpetrate fraud by allowing AMN to submit insurance claims to Steadfast after Imperial acquired AMN." It denied summary judgment on the alter ego theory of liability, however, finding

> that Steadfast has alleged facts sufficient to raise a dispute about whether it would be proper to pierce Imperial's corporate veil to hold it responsible for manipulating AMN's assets. In doing so, we are careful to distinguish the alleged wrong here - Imperial's manipulation of AMN's finances - from the alleged fraud by AMN for which we found Imperial not liable above.[fn]

*Steadfast Ins. Co.*, No. 97 C 5696, at 17 (N.D. Ill. Apr. 17, 2000).[12]

---

[12]Chief Judge Aspen continued in a footnote:

Rather, in this case "[t]he issue is not so much whether, for all purposes, the corporation is the alter ego of its stockholders or officers, nor whether the very purpose of the organization of the corporation was to defraud the individual who is now in court complaining, as it is an issue of whether in the particular case presented and for the purposes of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form." *Mesler* v. *Bragg Management Co.*, 216 Cal. Rptr, 443, 449 (1985). We appreciate Imperial's argument that its manipulation of AMN's assets was merely a failed attempt to make the company solvent enough to continue its operations, and we make no determination about whether Imperial is entitled to try to recoup some of the monies it infused to AMN. Our

Steadfast continued to pay claims after this litigation ensued, although the parties dispute exactly how much Steadfast paid.

## DISCUSSION

Steadfast's second claim for relief in its original, amended, and second amended complaints is brought pursuant to 720 ILCS 5/46-5(a), which states in pertinent part:

> A person who knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of any insurance company by the making of a false claim or by causing a false claim to be made on a policy of insurance issued by an insurance company . . . shall be civilly liable to the insurance company . . . in an amount equal to either 3 times the value of the properly wrongfully obtained or, if no property was wrongfully obtained, twice the value of the property attempted to be obtained, whichever amount is greater, plus reasonable attorneys fees.

Section 46-5(b), however, provides the obverse and is the basis for Imperial's counterclaim:

> An insurance company . . . that brings an action against a person under subsection (a) of this Section in bad faith shall be liable to that person for twice the value of the property claimed, plus reasonable attorneys fees. In determining whether an insurance company . . . acted in bad faith, the court shall relax the rules of evidence to allow for the introduction of any facts or other information on which the insurance company or self-insured entity may have relied in bringing an action under subsection (a) of this Section.

Under §46-5(b), then, to prove its claim, Imperial must demonstrate that Steadfast brought fraud

---

> holding today merely recognized that there is enough of a factual question about Imperial's motivations in this regard to deny summary judgment at this point.

*Id.* The facts Chief Judge Aspen believed may support piercing the corporate veil and relied upon when denying Imperial's motion for summary judgment on this issues are as follows:

> 1) Imperial adjusted its representations of AMN's available assets at various times during the litigation; 2) during this litigation, Imperial reclassified certain loans to AMN as capital infusions, but continued to count them as loans to be repaid; 3) Imperial has demanded and obtained repayment from AMN for certain loans, although it is not apparent whether AMN is solvent; and 4) certain of Imperial's inter-company payables, or "loans" to AMN were not formally memorialized, although Imperial contends that AMN is liable to repay them.

*Id.* at 16-17 (footnotes omitted).

claims against Imperial in bad faith.

At the threshold, the court must decide what bad faith means under Illinois insurance law. The parties have been unable to cite Illinois authority which resolves whether bad faith under § 46-5(b) entails intentional wrongdoing, as there are no reported cases and no legislative history addressing it. In general, however, "[t]he language of [a] statute itself is the best indication of the intent of the drafters and the words contained therein should be given their ordinary and popularly understood meaning." *Indiana Ins. Co.* v. *Machon & Machon, Inc.*, ___ N.E.2d ___, 2001 WL 747760, at *2 (Ill. App. Ct. June 29, 2001) (construing Illinois Code of Civil Procedure). In *Altman* v. *Health & Hospitals Gov. Comm'n of Cook Co.*, 91 Ill. App. 3d 498, 502, 414 N.E.2d 1091, 1094 & n.2 (1980), the court stated, "'Bad faith'" is a 'mixture of motive and result'" and referred to the Fifth Edition of BLACK'S LAW DICTIONARY 127 (1979) for a definition. Steadfast relies on the Sixth Edition's [13] definition of "bad faith," which states that the term "is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity" and that it differs from negligence "in that it contemplates a state of mind affirmatively operating with furtive design or ill will." BLACK'S LAW DICTIONARY 139 (6th ed. 1990). Steadfast also argues, citing *Chestnut* v. *Lodge*, 22 N.E.2d 36 (Ill. App. Ct. 1966), that under Illinois common law, bad faith entails an improper motive.[14] *See also Citizens First Nat'l Bank of Princeton* v. *Cincinnati Ins. Co.*, 200 F.3d 1102,

---

[13]Illinois court have stated that "[d]ictionary definitions are often employed to define terms which are undefined by a statute." *In re Bailey*, 740 N.E.2d 1146, 1156 (Ill. App. Ct. 2000). Inasmuch as Imperial does not rely on the Fifth or any other Edition, the court accepts Steadfast's representation of the Sixth Edition definition as a definition that would be accepted in the courts of Illinois.

[14]In *Chestnut*, the court ruled that where the State Department of Conservation had obeyed all the civil service rules, there could be no bad faith merely because the discharge "appeared to be politically motivated." "The proof of political motive, without more, is insufficient to overcome the existing presumption that the abolition is

1109 (7th Cir. 2000) (Construing exclusion in insurance contract that denied coverage for actions

taken in bad faith, the court stated, "[W]e do not attempt to define bad faith for Illinois

insurers--that is a job best left to the state's courts. Rather, we conclude only that Citizens' (and

[the district judge's]) proposed definition of the term to include some sort of intentional

wrongdoing was reasonable under the circumstances.") In a similar vein, Illinois courts have

stated that a claim against an insurance company for "unreasonable and vexatious" delay or

denial of a claim (215 ILCS § 5/155) ". . . must be strictly construed, because the provisions are

penal in nature and in derogation of the common law." *Morris* v. *Auto-Owners Ins. Co.*, 606

N.E.2d 1299, 1305 (Ill. App. Ct. 1993) (citing 44 AM.JUR.2D Insurance § 1772, at 759 (1982)).

Imperial argues that although Steadfast is liable under Steadfast's proposed definition of

bad faith, "bad faith" in the insurance context need not entail improper motive. Imperial cites

*Cramer* v. *Ins. Agency Exchange*, 675 N.E.2d 897 (Ill. 1996), in support of a less stringent

definition. *Cramer* treated a situation where a policyholder sued his insurer for fraud for

allegedly cancelling his policy without notice. The insurer argued that 215 ILCS § 5/155[15]

preempted the fraud claim. The Court held that it did not, but in so doing it also rejected a

doctrine that there is a common law tort of "bad faith and unfair dealing" in Illinois. Remedies

---

made in good faith." 22 N.E.2d at 40 (citing *O'Neill* v. *Fitzsimmons*, 114 Ill. App. 168, *aff'd*, 73 N.E. 797 (Ill. 1905)).

[15]Section 155 provides,

Attorney fees. (1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus [statutory penalties as prescribed].

of that sort available to a policyholder, the Court ruled, are limited to the legislative remedy of §

155 for vexatious and unreasonable insurer conduct.[16]  In light of this dictum, Imperial believes

that if conduct was "vexatious and unreasonable" it was done in bad faith, and citing *Schal Bovis,*

*Inc.* v. *Casualty Ins. Co.*, 732 N.E.2d 1082 (Ill. App. Ct. 1999), *and Cernocky* v. *Indemnity Ins.*

*Co. of North America*, 216, N.E.2d 198 (Ill. App. Ct. 1966), implies that mere negligence can be

bad faith in the insurance context.[17]

Having examined the cited materials, the court concludes that for purposes of § 155 bad

faith is vexatious and unreasonable, but vexatious and unreasonable is not necessarily bad faith

for purposes of § 46-5. The lack of the term "bad faith" in § 155 may indicate that the legislature

intended to create sanctions even where an insured could not establish wrongful subjective intent

of the insurer; possibly even in a situation of negligence.  *See* cases cited in footnote 17, *supra.*

*Cramer*, while suggesting that bad faith and "vexatious and unreasonable" refer to conduct of the

---

[16]Section 155, the Court in *Cramer* explained,

. . . provides an extracontractual remedy for insurer misconduct that is vexatious and unreasonable. Well-established tort actions, such as common law fraud, require proof of different elements and remedy a different sort of harm than the statute does.  These torts address insurer misconduct that is not merely vexatious and unreasonable.  The statute was not intended to insulate an insurer from such tort actions.
     Much of the confusion among the appellate and federal courts arises from the interaction of the statute and the tort of bad faith and unfair dealing.  Unlike an action in fraud, *a bad-faith action involves insurer misconduct that is similar to unreasonable and vexatious misconduct.*

*Id.* at 902-903 (emphasis added).

[17]*Schal Bovis* merely states that "[a] complaint for bad faith sounds in tort, and is subject to all of the requirements of a traditional negligence complaint" 732 N.E.2d at 1092 and that conclusional allegations of negligence or bad faith are insufficient to state claims under either theory of liability.  Likewise, *Cernocky* states that "negligence or bad faith[, as opposed to fraud,] is the standard of conduct to be applied to the facts in determining whether the insurer is liable beyond the policy limits for failing to settle the case." 216 N.E.2d at 205 Although *Cernocky* defined "bad faith" as being "unfaithful to the duty or obligation that is owed," *id.*, the case was decided 30 years prior to *Cramer,* where the Illinois Supreme Court failed to specifically embrace this definition.  As such, this court does not believe that *Cernocky*'s definition definitively applies here.

15

same stripe, does not define either term or state the elements of proof under § 155. In *Stender* v. *Provident Life & Accident Ins. Co.*, No. 98 C 1056, 2001 WL 811159 (N.D. Ill. July 17, 2001), the court interpreted "vexatious and unreasonable" as having both objective and subjective components, the latter being whether the insurer and insured had a "bona fide" dispute as to coverage[18] Thus, it appears that even under § 155 an insured may need to demonstrate conduct that amounts to subjective bad faith, either directly or through inference from the "totality of the circumstances." For § 46-5(b), however, the explicit use of the term bad faith leaves little room to doubt that liability must be predicated on proof of ". . . a state of mind affirmatively operating with furtive design or ill will." The notion that it is a mixture of motive and result suggests that

---

[18]In construing § 155, the court *in Stender* explained as follows:

> The parties are at odds as to whether or not the analysis of vexatious and unreasonable conduct requires the court to take into consideration the subjective intent and good faith of the insurer, or merely whether or not the conduct was objectively reasonable. There appears to be some conflict in the caselaw. In, *Citizens First Nat. Bank of Princeton* v. *Cincinnati Ins. Co.*, 200 F.3d 1102 (7th Cir.2000) the court held:
>
> > Attorney fees may not be awarded against an insurer, under Illinois law, simply because the insurer took an unsuccessful position in litigation, but, rather, only where the evidence shows that the insurer's behavior was willful and without reasonable cause; this means that an insurer's conduct is not "vexatious and unreasonable" if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law.
>
> The requirement that the dispute be "bona fide" implies that there be a good faith belief as to the application of insurance coverage. Thus, a subjective component is part of the evaluation of the insurance company's actions. This conclusion appears to be supported by a number of courts which have found that in making this determination we should consider the totality of the circumstances, including the insurer's attitude. [citations and summary comment omitted] Thus, we look at the totality of the evidence in determining whether or not the dispute set forth as to coverage by Provident was both reasonable, and bona fide in the sense that it was made in good faith.

2001 WL 811159, at *1-2.

motive can be inferred from other evidence. For these reasons, the court adopts Steadfast's view

that improper motive must be established to prevail under § 46-5(b). Subjective intent is

generally a jury question, *see, e.g., Marthon* v. *Maple Grove Condo. Assoc.*, 101 F. Supp. 2d

1041, 1051 (N.D. Ill. 2000) (discriminatory intent "is classically for resolution by a factfinder");

*Mulliken* v. *Lewis*, 614 N.E.2d 25, 27 (Ill. App. Ct. 1993) (intent of the parties in a contract

dispute is a "question[] of fact for the trier of fact"). Thus, as indicated above, summary

judgment is appropriate only if no reasonable jury could find in favor of the non-moving party.

We turn to the issue of whether there is no genuine issue of material fact that Steadfast in

bad faith sued Imperial accusing Imperial of having participated in making false claims against

Steadfast. The court will proceed by examining the totality of the circumstances. *See Buais* v.

*Safeway Ins. Co.*, 656 N.E.2d 61, 64 (Ill. App. Ct. 1995) (In determining whether an insurer is

guilty of vexatious or unreasonable conduct under § 155, the court must consider the totality of

the circumstances.) To demonstrate bad faith, Imperial relies on three principal pieces of

evidence: (1) although Steadfast admittedly investigated Imperial's acquisition of AMN and did

not "hastily conceive" its originally-filed complaint, Steadfast's original complaint did not

contain one substantive allegation against Imperial for fraud under § 46-5(a) (Imperial also

argues that subsequent complaints likewise failed to contain any substantive allegations

pertaining to § 46-5(a), but Imperial focuses on the original complaint because it believes that

amendments made to Steadfast's original complaint do not "vitiate Steadfast's prior bad faith

conduct, which culminated in the filing of its factually barren complaint." (Steadfast Reply at

2.))[19]; (2) Steadfast's bad faith is apparent from its conduct surrounding and at the September 1997 Tulsa meeting, as well as Bauer's deposition testimony that he could not specifically recall whether he possessed the second amended complaint's factual allegations when Steadfast filed the original complaint; and (3) the expert opinions of Northwestern University Law School Professor Steven Lubet regarding the purpose behind § 46-5(b) and litigator Stephen Diamond, discussed in detail below, regarding any inference to be made from the absence of substantive allegations in a complaint.[20]

Steadfast, in response, contends that Imperial has failed to meet its evidentiary burden. Steadfast argues (1) that no wrongful intent can be inferred from its original complaint because it complied with the requirements of federal notice pleading and that the Illinois statute cannot change these federal pleading requirements (i.e., the original complaint contains substantive allegations pled with particularity as is required for fraud claims, which position the court finds problematic at best); (2) that it did not file the complaint to avoid making payment under the policy and that its payments on the claims precludes a bad faith finding, (3) that Bauer's

---

[19]Steadfast contends that the second amended complaint superseded all prior complaints, so this is the version that this court should examine. With regard to the second amended complaint, Steadfast believes there can be no bad faith where this court has denied Imperial's motion to dismiss and motion for summary judgment. The court agrees with Imperial that the operative complaint filing is the one that initiated this action, as the statute plainly states that "[a]n insurance company . . . that *brings* an action . . . in bad faith shall be liable . . . ." 720 ILCS 5/46-5(b) (emphasis added). *Cf. Ultra-Temp Corp.* v. *Advanced Vacuum Sys., Inc.*, 194 F.R.D. 378, 382 (D. Mass 2000) ("The violation of [Federal] Rule [of Civil procedure] 11 that occurred when an inadequate pre-filing investigation was done before the filing of the original complaint is not cured by the filing of an amended complaint which contains the same claims even if the plaintiff has engaged in substantial discovery between the filing of the original and amended complaints); *Edward Yavitz Center, Ltd.* v. *Allen*, 608 N.E.2d 1235, 1241 (Ill. App. Ct. 1993) (rejecting the contention that "a valid amended complaint insulates a plaintiff from any sanctions [under Illinois Supreme Court 137] based on the filing of a frivolous or otherwise sanctionable complaint in the first instance). The amendments are evidence relevant to Steadfast's intent, and the evidence (the later-filed complaints as well as the deposition testimony submitted), shows that a genuine factual dispute exists regarding whether Steadfast brought the action in bad faith.)

[20]The court notes that neither party cited, and the court's own research was unable to find, any case law or legislative history regarding 720 ILCS § 5/46-5(b).

deposition testimony that the bases for both the original and second amended complaint are the same precludes a bad faith finding, and (4) that Imperial's expert testimony does not support a bad faith finding and, besides, it should be stricken because it is improper evidence.

This recitation of the arguments demonstrates that, even though (as the court finds) that the original complaint contained no substantive allegations against Imperial, summary judgment is not appropriate in favor of either party. The fact that Steadfast's second amended complaint contained significantly more details about Imperial's alleged involvement than its earlier manifestations does not definitively lead to the conclusion that it filed the action in bad faith, just as Chief Judge Aspen's finding that the second claim against Imperial could not withstand summary judgment likewise does not render the initiation of that claim in bad faith. Litigants frequently file inartfully-drafted complaints that fail to make it past a dispositive motion. Rarely do litigants even seek relief under Rule 11, much less a statutory penalty, and this court is reluctant to infer bad faith solely from such conduct. Bauer's testimony arguably helps and hinders both parties, as suggested by the fact that both parties cite to his testimony in support of their arguments, the interpretation of which is a jury function. In addition, the fact that Steadfast continued to pay claims after initiating this action does not, as Steadfast argues, preclude a bad faith finding, and neither *Pekin Ins. Co.* v. *Home Ins. Co.*, 479 N.E.2d 1078 (Ill. App. Ct. 1985), nor *Bituminous Cas. Corp.* v. *Iowa Nat'l Mut. Ins. Co.*, 477 N.E.2d 694 (Ill. App. Ct. 1985), cited by Steadfast, convince the court otherwise. In *Pekin*, 479 N.E.2d at 35, the Illinois Appellate Court held that an insurance company had "obviously avoided a bad faith action by doubly fulfilling its duty to defend," and in *Bituminous*, 477 N.E.2d at 872, the court found that an insurance company's declaratory judgment suit against another insurance company regarding

19

which company was obligated to defend the insured was "not a bad faith or vexatious attempt to avoid contractual obligations." Both these statements, made without further discussion, are far cries from a rule of law holding that the performance of contractual duties always precludes a bad faith finding.

With respect to the proffered expert testimony of Professor Lubet and Mr. Diamond, evens if accepted, neither of these statements, either standing alone or in conjunction with Imperial's other evidence, shows that Imperial is entitled to summary judgment. Imperial relies on statement that § 46-5(b)'s function was to ensure that § 46-5(a), which entrusts "a private actor with self-interest in defeating claims and increasing recoveries, is used "responsibly and not oppressively." (Imperial's Opening Brief at 7 n.9.) Imperial also quotes Diamond's deposition testimony where he explained that "the absence of substantive allegations in the complaint is an indication to me and supports a conclusion by me that there were no facts or information which had been developed during the prefiling investigation or they would have been in the complaint." (*Id*. at 8.). The first statement merely states what appears to be the obvious reason for enactment of a statutory section such as § 46-5(b) and is irrelevant in any event, and the second is simply one attorney's statement about one inference that might be drawn from examining Steadfast's complaint. For purposes of deciding the summary judgment motions presently before the court, therefore, Imperial's expert testimony is inconsequential. Thus, as indicated, summary judgment will be denied.

With regard to whether the court should exclude this testimony from trial, Imperial admits that neither witness may testify to the legal interpretation of the § 46-5(a) and (b). Imperial argues instead that Lubet's and Diamond's testimony "will provide admissible factual

testimony regarding the duty of a party and its representative to reasonably investigate facts before bringing suit, and an assessment of Steadfast's conduct against that standard." (Imperial's Reply at 12.) The Seventh Circuit has determined in cases cited by Steadfast "that Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case. That is, they cannot testify about legal issues on which the judge will instruct the jury." *United States* v. *Sinclair*, 74 F.3d 753, 758 n.1 (7th Cit. 1996) (citing *Bammerlin* v. *Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994) and *Harbor Ins. Co.* v. *Continental bank Corp.*, 922 F.2d 357, 366 (7th Cir. 1990)). Imperial's duty of investigation under Rule 11 is a matter of law on which the court will presumably instruct; the assessment of how well Steadfast measured up against that standard is for the jury to consider in reaching its verdict on the ultimate question. For these reasons, the court grants Steadfast's motion to exclude Lubet's and Diamond's testimony.

## CONCLUSION

For the above-stated reasons, the court denies both Imperial's and Steadfast's motions for summary judgment on Imperial's counter-claim [#157 and # 164-1], and grants Steadfast's motion to exclude the testimony of Stephen Diamond and Steven Lubet [#164-2]. This matter is set for status on August 30, 2001, at 9:30 a.m.

Date: July 31, 2001

Enter: _Joan H Lefkow_
JOAN HUMPHREY LEFKOW
United States District Judge

21