# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 5696 | **DATE** | 7/31/2001 |
| **CASE TITLE** | Steadfast Insurance Co., Inc. vs. Auto Marketing Network, Inc., et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Motion of plaintiff for partial summary judgment [129-1] is denied. Plaintiff's motion to quash [181-1] is denied. Motion of defendant Auto Marketing Network to stay [187-1] is denied. Motion of defendant Auto Marketing Network to exclude the presently proffered testimony of Virgil Barker [155-1] is granted. Status heaing is set for 8/30/01 at 9:30 a.m. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | AUG 0 2 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | **193** |
| | Mail AO 450 form. | | 8/1/2001 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| MD | courtroom deputy's initials | ED:7 FILED FOR DOCKETING 01 AUG -1 PM 3: 44 | MD mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

STEADFAST INSURANCE CO., INC., )
                                      )
        Plaintiff, )
                                        )      97 C 5696
                                        )
        v. )
                                        )
AUTO MARKETING NETWORK, INC. and )
IMPERIAL CREDIT INDUSTRIES, INC., )
                                        )
        Defendants. )

**DOCKETED**
AUG 2 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff Steadfast Insurance ("Steadfast") filed suit against Auto Marketing Network, Inc.

("AMN") and its successor, Imperial Credit Industries, Inc. ("Imperial"), contending, among

other things, fraud and breach of contract, based on AMN's alleged failure to adhere to the terms

of an insurance policy entered into between the parties and its wrongful issuance of loans

covered by the policy.[1]  Steadfast has moved for partial summary judgment on counts III and IV

of its complaint (declaratory judgment and breach of contract, respectively).  The court denies

Steadfast's motion but frames and narrows the triable issues as articulated below.[2]

---

[1] On April 17, 2000, Chief Judge Aspen, the district court judge to whom this case was originally assigned, granted "Imperial's motion for summary judgment in part and [found] that Imperial [was] not liable for any of Steadfast's losses arising from payments to AMN for defaulted loans."  Chief Judge Aspen also found, however, that there remained "a question of fact about Imperial's actions with regard to AMN's finances" and denied summary judgment "to the extent that Imperial [sought] to be shielded from liability for manipulating AMN's Finances." *Steadfast Ins. Co., Inc.* v. *Auto Marketing Network, Inc.*, No. 97 C 5696 (N.D. Ill. Apr. 17, 2000).

[2] Partial summary judgment is only appropriate if granting such relief will dispose of one or more counts in their entirety. *See Grochocinski* v. *Dunkley (In re Dunkley)*, No. 97 B 34514, 1999 WL 669252 (Bankr. N.D. Ill. Aug. 24, 1999) (collecting cases).  Although this court finds in favor of Steadfast on a number of issues, none of these findings will dispose of either counts III or IV in their entirety.  However, Federal Rule of Civil Procedure addresses instances where a case is not fully adjudicated on a summary judgment motion and "provides a method whereby a court can narrow issues and facts for trial after denying in whole or in part a Rule 56 motion." *Id.*



## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS

In 1992, AMN entered into the business of purchasing sub-prime auto loans from borrowers with less than perfect credit and then repackaging and selling these loans to the secondary financial market. In order to protect itself from the possibility that some borrowers would default on the loans AMN purchased, AMN contracted with Steadfast to obtain insurance against such defaults. Steadfast eventually issued AMN an insurance policy (the "Policy") to

2

insure all the loans AMN issued from November 1, 1992 to May 1, 1994.

In order to help it determine whether or not to purchase the loan of a particular borrower (also known as originating a loan), AMN drafted a set of underwriting guidelines (the "Guidelines") for its underwriters to use when originating loans that would be insured by Steadfast. The Guidelines were incorporated into the Policy by reference and divided potential borrowers into categories A, B, C, and D, with A and B denoting borrowers with a lower risk of default, C borrowers being those with the highest risk of default who were still eligible to receive a loan, and D individuals being those people whose credit history and other risk factors made them ineligible to have their loan purchased by AMN.[3] During the term of the Policy, AMN originated approximately 5,328 loans. As of December, 1998, approximately 43% of these loans had defaulted,[4] and Steadfast contends that it has paid approximately $14 million to AMN under the Policy.[5]

## DISCUSSION

Steadfast argues that it is entitled to summary judgment on four issues: 1) that the Policy

---

[3]Specifically, the Policy states that it "does not apply to any default loss . . . under a finance contract which . . . has been granted to an account debtor who has a credit risk category other than 'A', 'B' or 'C.'" (Policy § VI.B.) Credit risk category is defined as "the credit quality grade that results from the credit underwriting analysis based on the guidelines [AMN has] provided to [Steadfast.]" (Policy § VIII.F.)

[4]The parties dispute whether testimony from a witness at a preliminary injunction hearing in December, 1998 supports the 43% loan default estimation. Steven Bauer, the Casualty and Miscellaneous Claim Director for Zurich Insurance Company, which wholly owns Steadfast, testified that the 43% default rate found after reviewing 193 files was representative of the default rate at the time of the preliminary injunction hearing. Specifically, Bauer was asked, "As of this date, does the 43 percent roughly approximate the percentages that Steadfast is seeing in its default rates on which it is paying insurance proceeds?" And Bauer responded, "I think it's slightly in excess of 43 percent." (Pl.'s Ex. 14, at 66; Def.'s Ex. 5, at 66.) The court believes that Bauer's statements adequately support the assertion that 43% of the loans were in default at the time of the preliminary injunction hearing, and, aside from arguing the contrary, AMN has tendered no evidence casting doubt on this testimony.

[5]The Policy limited Steadfast's liability to a total of $15 million. AMN contends that it has been unable to verify Steadfast's claim that it has paid out approximately $14 million.

3

required all loans to conform to either an A, B, or C credit risk; 2) that the definition of what constitutes an A, B, or C credit risk can be determined solely from the terms of the Guidelines, and that such Guidelines are not ambiguous; 3) that loans which did not adhere did not adhere to the Guidelines were not covered under the Policy; and 4) that 94.8% of the loans that defaulted were issued in contravention of the Policy and thus breached the contract between AMN and Steadfast. In response, AMN contends that there are disputed issues of fact with regard to whether the Guidelines are ambiguous, whether AMN adhered to the Guidelines when originating loans, and whether Steadfast waived its arguments by conducting an earlier audit of AMN's loan files that agreed with most of AMN's underwriting decisions, including those it now disputes.

**Does the Policy require all applicants at least to meet the criteria listed in the C risk category?**

Steadfast claims that nearly 95% of all defaulted loans did not meet the requirements for at least a C rating and thus should never have been approved by AMN. AMN does not deny that the Guidelines required every loan to be categorized as A, B or C before it would be insurable under the Policy. Further, although AMN contends that the Guidelines were ambiguous because they employed imprecise terms which allowed the underwriters to use their discretion in some instances, it presents no evidence that an underwriter could ignore one or more of the criteria altogether.[6] In fact, in making its argument that some of the individual Guidelines were ambiguous, AMN recognizes that "a loan applicant **must meet** such imprecise requirements

---

[6] Indeed, the Guidelines provide that "applications will be declined which contain incomplete information regarding [the loan applicant's] job history, residence history, personal references, vehicle or mortgage information or income." Thus if AMN approved any loan to which it did not apply one or more Guidelines because the application was incomplete, the court concludes that AMN breached the Policy with regard to these loans, if any.

as: . . . ." (AMN Resp. at 3) (emphasis added). Thus, the court finds in favor of Steadfast on Issues One and Three and concludes that the Policy required every loan AMN originated to meet the credit risk categories of A, B or C, and that those loans (if any) that did not constitute at least a "C" rating were not covered by the Policy.

**What qualifies as a C credit risk?**

The next issue is whether it is up to the court or the jury to determine what the Guidelines mean when they describe the criteria for a borrower to receive a rating of A, B or C, and in either instance whether an issue of fact exists requiring a trial. AMN argues that the meaning of particular Guidelines is ambiguous, creating questions of fact about what the Guidelines mean and whether they were met when AMN underwrote each loan. AMN further asserts that both parties expected that AMN's underwriters could use their judgment in applying the Guidelines in certain cases. Steadfast counters that there is no dispute among the parties as to what constitutes the terms of the Credit Risk Categories A, B and C because the terms are plainly set forth in the Guidelines which AMN drafted for its own use when approving loans. Moreover, Steadfast points out that AMN executives admitted that at times, they used certain "unwritten exceptions" to deviate from the Guidelines, if approved by AMN's head of underwriting – an admission that Steadfast contends is tantamount to admitting AMN breached the Policy.[7] In order to rate a borrower with a "C" rating, the Guidelines set forth the following criteria:[8]

---

[7]AMN describes these "admissions" as limited exceptions to certain "rigid" Guidelines, and argues (with some support in the record), that Steadfast took certain of these admissions out of context. In any event, the court does not find that the statements by AMN's executives are unequivocal enough to constitute an admission that AMN breached the Policy.

[8]Both parties focus almost exclusively on the "C" rating criteria because Steadfast's major argument is that many of the loans AMN originated were to borrowers with worse than "C" credit ratings who should have been rejected.

Stable employment: At least one year with present employer or work stability.

Stable Residence: One year at current address or at least three years in the area and five years trackable residence.

Ratio of net spendable income to gross income should exceed 50%.

Two or more years on Credit Bureau with a minimum high credit of $2,000. If the above credit criteria is not met, a co-borrower or co-lessee must be "A" credit, blood relative (mother, father, brother, sister, grandmother, grandfather), homeowner or long-term renter. Co-borrower is not acceptable to offset low income, but is used for credit enhancement.

Maximum delinquency in which customer can be considered:
      Financial lending institution - two 30 day and one 60 day within the last two years.
      Retail Credit (department stores, etc.) - limited delinquency up to 120 days within the last two years.

There may have been a more severe credit problem before the last two years, but recent payment history shows acceptable experience with trend toward good credit.

No current delinquent accounts with financial lending institutions.

If there are any outstanding collection accounts, liens, judgments and/or disputed accounts, they must show satisfactory documentation with adequate explanation.

If a previous bankruptcy, must show three years of reestablished credit with a proven track record.

     Contract construction and interpretation are questions of law. *Houben* v. *Telular Corp.*, 231 F.3d 1066, 1072 (7th Cir. 2000); *Forest Glen Cmty. Homeowners Ass'n.* v. *Bishof*, 746 N.E.2d 1285, 1289 (Ill. App. Ct. 2001). Under Illinois law, which the parties agree controls, "'[w]hen construing a contract, our duty is to effectuate the intent of the parties to the contract. The intent of the parties must be determined from the plain and ordinary meaning of the language of the contract unless the contract is ambiguous.'" *Shaffer* v. *Liberty Life Assur. Co. of Boston*, 746 N.E.2d 285, 288 (Ill. App. Ct. 2001) (quoting *In re Nitz*, 739 N.E.2d 93, 98 (Ill. App. Ct.

2000) (internal citation omitted)). A contract is ambiguous only if it is susceptible to more than one interpretation, but an ambiguity will not be found solely because the parties disagree on its meaning. *Pokora* v. *Warehouse Direct, Inc.*, ___ N.E.2d ___, 2001 WL 647858, at *4 (Ill. App. Ct. June 7, 2001). If, however, a particular term is found to be ambiguous, the court (if the facts are undisputed or the factual disputes will not govern the outcome) or the trier of fact (when material fact issues arise) can then look to extrinsic evidence to try to resolve the ambiguity. *Thomas* v. *Pearle Vision, Inc.*, 251 F.3d 1132, 1136 (7th Cir. 2001) ("Under Illinois law a genuine issue of material fact exists in contract cases when a key provision of a contract is ambiguous, requiring admission of extrinsic evidence."); *Houben*, 231 F.3d at 1072 ("If the contract is ambiguous, the proper construction of the contract's terms–that which accords with the intent of the parties–is a question of fact, and we may turn to extrinsic evidence to determine the intent of the parties."); *McDonald's Operators Risk Mgmt. Ass'n.* v. *Coresourse, Inc.*, 717 N.E.2d 485, 488 (Ill. App. Ct. 1999) ("A genuine issue of material fact exists in contract cases when a key provision of a contract is ambiguous, requiring admission of extrinsic evidence. Whether such ambiguity exists is a question of law for the circuit court to decide; if reasonable persons could draw different inferences from undisputed facts, summary judgment is inappropriate, and the matter should proceed to trial.") (citation omitted); *N.W.I. Int'l, Inc.* v. *Edgewood Bank*, 684 N.E.2d 401, 408 (Ill. App. Ct. 1997) ("If the intent of the parties can be determined from facts not in dispute, then the meaning of the contract can be determined by the court as a matter of law. However, if the ambiguity can only be resolved by resort to facts in dispute, then the contract must be construed by the trier of fact.") (citations omitted).

Another element of contract construction is the doctrine that generally insurance policies

are construed in favor of the insured, in this case, AMN, because "(1) the intent of an insured in purchasing an insurance policy is to obtain coverage, and therefore any ambiguity jeopardizing such coverage should be construed consistent with the insured's intent; and (2) the insurer is the drafter of the policy and could have drafted the ambiguous provision clearly and specifically." *Michael Nicholas, Inc.* v. *Royal Ins. Co. of America*, 748 N.E.2d 786, 791 (Ill. App. Ct. 2001). *See also Winter* v. *Minnesota Mut. Life Ins. Co.*, 199 F.3d 399, 409 (7th Cir. 1999) ("If the term is ambiguous, the court must construe the term against the insurer and in favor of the insured."); *Indiana Ins. Co.* v. *Liaskos*, 697 N.E.2d 398, 573-74 (Ill. App. Ct. 1998) ("Where ambiguous, the terms of a policy must be construed against the drafter of the policy and in favor of the insured."). In this case this principle applies to the insurance contract itself, but because AMN drafted the Guidelines for use by its own underwriters, the reasoning behind construing the contract in favor of the insured is not entirely appropriate. At the same time, this court does not believe that AMN's drafting of the Guidelines warrants following "the general rule that ambiguous contract language is to be construed against the drafter," *Smith* v. *Allstate Ins. Co.*, 726 N.E.2d 1, 7 (Ill. App. Ct. 2000), as explained below, but in instances where AMN argues that it does not know the meaning of a particular term or word, but does not offer its own alternative explanation, the court will accept Steadfast's reasonable definition, because as the drafter, AMN should certainly know the meaning of the terms it chose to use.

The court's task is complicated here because, unlike most cases concerning ambiguity, neither side presents a clear explanation of what it thinks some of the particular Guidelines actually mean. This is not a case in which each party advocates its own interpretation of a particular term and asks the court to decide if both positions are reasonable (in which case there

8

is an ambiguity) or if the term has only a single reasonable interpretation.  Instead, Steadfast

argues that the Guidelines as a whole are clear on their face, especially given the fact that AMN

drafted them with the knowledge that they would be used to measure the risk of insuring

borrowers with troubled credit histories –that is, each term should be applied to minimize the risk

of default.  Further, although Steadfast offers its own explanation for some of the Guidelines

AMN contends are ambiguous, it does not interpret every one, allowing some of AMN's

contentions to stand.

AMN, in contrast, argues that some of the individual Guidelines are ambiguous because

they allow or even require the underwriters to use discretion about how to apply certain

individual criteria.  For example, AMN complains that the Guidelines do not explain what is

meant by "work stability" in the work history Guideline, or "three years in the area" in the

residence Guideline.   AMN also points to testimony by certain Steadfast executives that

underwriting is a discretionary process that must rely on an individual underwriter's judgment,

and points out that in its brief, Steadfast admits that "in certain circumstances, the Guidelines

provide for discretion with respect to determining whether a particular requirement is satisfied."

(Steadfast Br. at 9).

Based on its review of the Guidelines, the court cannot make a single decision about their

ambiguousness as a whole; there are too many terms and conditions at issue.  Instead, the court

must look at each Guideline individually to determine whether it is subject to more than one

reasonable interpretation.  In doing so, the court assumes that this contract for insurance did not

vest in Steadfast any authority to supervise the ongoing course of AMN's business.  Thus,

AMN's Guidelines may well require or permit its underwriters to use discretion in applying it to

9

a specific loan application. That a term permits a party to exercise discretion does not necessarily mean that the term is ambiguous. Rather, it merely means that the party has reserved the right to exercise its discretion. Thus, where the court finds that a term permits AMN to exercise its discretion, then a reasonable exercise of discretion is not a basis to deny coverage of the affected loan. Whether the exercise of discretion was reasonable, however, is a question for the jury and if a Guideline is clear and does not provide any room for discretion, then the failure of a particular loan to adhere to the requirement constitutes a breach of the Policy.[9]

1.   *Stable employment: At least one year with present employer or work stability.*

On its face, this Guideline allows the underwriter to use discretion in deciding whether to grant the loan based on the applicant's work history of less than one year with present employer. Because "work stability" is not defined, this Guidelines allows for underwriter discretion, and, therefore, a jury must decide whether an exercise of that discretion was reasonable.[10]

2.   *Stable Residence: One year at current address or at least three years in the area and five years trackable residence.*

Likewise, the term "in the area" is subject to interpretation, and, again, the court will leave to the jury the determination of whether the underwriter reasonably applied this term. The court notes, however, that this criterion also requires an applicant to have five years trackable residence if the applicant cannot meet the "one year at current address" requirement. Thus, to the extent that any applications without one year at their current addresses do not have not have five

---

[9]AMN does not argue that failure to follow the Guidelines would not constitute a material breach of the Policy and, therefore, the court assumes that such failure is material.

[10]Even if this court accepted Steadfast's proffered evidence that both parties agree that "work stability" refers to an applicant having no more than 30-day gaps between jobs, neither party stated how long an applicant must have worked without a gap longer than 30 days.

years of verifiable addresses, the borrower does not satisfy this Guideline, no matter how an underwriter interpreted whether the applicant had been "in the area" for three years.

3.    *Ratio of net spendable income to gross income should exceed 50%.*

With regard to the next criterion, AMN argues that the term "ratio of net spendable income to gross income should exceed 50%" allowed for discretion because the word "should" implies discretion. The court disagrees. Webster's Dictionary defines the word "should" as "used to express duty or obligation" and also as "used to express conditionality or contingency." Webster's II New College Dictionary 1022 (1995). Inasmuch as a standard dictionary is a customary source for "plain and ordinary meaning," the reasonable interpretation of this criterion is that the ratio of net income to gross income was required to exceed 50% before an application may be approved. However, Steadfast's own actions have created a latent ambiguity concerning the meaning of this criterion. The evidence shows that Steadfast audited some of the loans while the Policy was in effect specifically with regard to this factor and in many cases agreed with the underwriting decision. It is not apparent whether Steadfast now contends that any or all of these loans do not adhere to this specific criterion even though the earlier audit found that they did. Thus, the court declines to hold that this criterion is unambiguous in its allowance for discretion and reserves the question of interpretation for the jury.[11]

---

[11]The court's holding with regard to this criterion demonstrates the existence of a so-called latent ambiguity. That is, the language of the Guideline itself may be clear, but when one examines outside evidence, an ambiguity emerges. *See Bourke* v. *Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998); *American Family Mut. Ins. Co.* v. *Hinde*, 705 N.E.2d 956, 959 (Ill. App. Ct. 1999). Although the idea that a court can examine extrinsic evidence to determine whether a latent ambiguity exists appears to contradict the idea that if a contract is unambiguous no extrinsic evidence may be considered, this contradiction was examined by the Seventh Circuit in *AM Int'l, Inc.* v. *Graphic Mgmt. Assoc., Inc.*, 44 F.3d 572, 575 (7th Cir. 1995). In that case, the Seventh Circuit explained that "[a] review of the doctrines that allow this penetration of semantic surfaces suggests that the key is the distinction between what might be called 'objective' and 'subjective' evidence of ambiguity." *Id.* The Seventh Circuit defined "objective evidence" as "evidence of ambiguity that can be supplied by disinterested third parties" and "subjective evidence" as "testimony of the parties themselves as to what they believe the contract means. Such

4. *Two or more years on Credit Bureau with a minimum high credit of $2,000. If the above credit criteria is not met, a co-borrower or co-lessee must be "A" credit, blood relative (mother, father, brother, sister, grandmother, grandfather), homeowner or long-term renter. Co-borrower is not acceptable to offset low income, but is used for credit enhancement.*

AMN does not contest the meaning of this criterion except to argue that it does not know the meaning of "minimum high credit," without offering its own explanation for the term. In this case, given that AMN drafted the term, we accept Steadfast's reasonable explanation that this means a loan applicant must have at least achieved a credit maximum of $2,000.

5. *Maximum delinquency in which customer can be considered:*
*Financial lending institution - two 30 day and one 60 day within the last two years.*
*Retail Credit (department stores, etc.) - limited delinquency up to 120 days within the last two years.*

AMN's main objection to this Guideline is that "financial lending institution" and "retail credit" are not defined. Even overlooking the fact that "retail credit" is defined in the Guideline as referring to "department stores, etc.," this term does not allow for underwriter discretion. The plain meaning of "financial lending institution" is any sort of bank, savings and loan, credit union, or other entity that lends individuals money for a variety of reasons, and "retail credit" refers to the ability to borrow money for consumer goods, such as through department store credit cards.

6. *No current delinquent accounts with financial lending institutions.*

As explained directly above, the term "financial lending institution" is readily definable,

---

testimony is invariably self-serving, being made by a party to the lawsuit, and is inherently difficult to verify." *Id.* Only "objective" evidence is admissible to show a latent ambiguity *Id.* The Seventh Circuit noted, however, that these terms were to be used "informally, rather than with an approach to philosophical precision." *Id.* In this case, Steadfast's prior audits demonstrate that its own auditors might have interpreted the words "should exceed" to mean "may exceed." Contrary to being self-serving, this evidence undermines Steadfast's position and, therefore, appears more akin to "objective," rather than "subjective," evidence.

and, thus, if an applicant had any outstanding bank loans at the time of the application, he or she could not be classified as a "C" credit risk.

7.   *If there are any outstanding collection accounts, liens, judgments and/or disputed accounts, they must show satisfactory documentation with adequate explanation.*

Although this Guideline allows the underwriter the discretion to decide what constitutes "satisfactory documentation" and "adequate explanation," Steadfast correctly notes that an applicant who provided *no explanation* for "outstanding collection accounts, liens, judgments and/or disputed accounts" would not qualify as a "C" credit risk. Otherwise, a reasonable exercise of discretion would not lead to denial of coverage. Whether the exercise of discretion was reasonable is a question for the jury.

8.   *If a previous bankruptcy, must show three years of reestablished credit with a proven track record.*

On its face, this Guideline allows the underwriter to use discretion when evaluating whether an applicant has shown "reestablished credit with a proven track record."[12]

To summarize, the court finds that Guideline numbers four, five, and six did not allow for underwriter discretion and if AMN designated any applicant a C credit risk who did not meet all the criteria set forth in these Guidelines (in the manner explained above), AMN breached the Policy with respect to these loans. Moreover, although the court finds that Guideline number two allowed AMN to use some discretion, if a loan applicant could not meet the "one year at current address" requirement, that applicant must have met the "five year trackable residence" requirement in order to qualify as a C credit risk. The same is true with Guideline number seven,

---

[12]Again, because the court does not believe that this Guideline is ambiguous simply because it allows the underwriter to use discretion, this court will not consider the parol evidence submitted by Steadfast regarding the testimony of Neil Corn, AMN's Vice President of Underwriting , that AMN "would look for nothing less after the bankruptcy [than] perfect credit." (Corn Dep. at 116-17.)

which allows the underwriter discretion to determine whether the applicant provided "satisfactory documentation" and an "adequate explanation" for "outstanding collection accounts, liens, judgments and/or disputed accounts" but leaves no discretion to grade the applicant a C credit risk if that applicant provided no documentation or explanation at all for these problems. Finally, the court finds that Guideline numbers one, eight, and possibly three, allowed for underwriting discretion and, as with any discretion within these Guidelines, the jury must decide whether the underwriters reasonably exercised such discretion. In the end, however, the court's present findings still do not entitle Steadfast to judgment even regarding Guidelines that did not allow for underwriter discretion because the question remains whether AMN actually failed to apply these Guidelines in the manner explained above. This brings us to the fracas over Steadfast's expert.[13]

---

[13] Actually, one more issue has been addressed by the parties that warrants examination by the court. In addition to arguing that the Guidelines are ambiguous, AMN also asserts that a question of fact exists as to whether Steadfast is estopped from arguing, or waived its argument, that AMN deviated from the Guidelines based on three audits Steadfast conducted in 1993 and 1994. Steadfast's auditor, Michael Kerner, concluded after an auditing 49 files in June, 1993 and 110 files in October, 1993, that he "was in agreement with the credit decision made by AMN loan underwriters, almost without exception" and "found the quality of credit to be somewhat higher than expected." (AMN Ex. 12 at 2 & 5.) Steadfast has presented evidence, however, that Kerner only analyzed compliance with one of the Guidelines –namely, the ratio of net spendable income to gross income should exceed 50%– when reviewing the files. Moreover, although AMN contends that Kerner completed a third audit in January, 1994, it submitted no evidence of this audit. The only January, 1994 audit report the court could locate was conducted by Baker & Associates, Steadfast's purported expert in this case regarding Guideline compliance, *for Daiwa Securities America, Inc.* regarding 350 randomly-selected non-defaulted loans originated by AMN and purchased by Daiwa. Baker generally observed that "[c]ost considerations aside, sub-standard auto paper should have a review & approval underwriting process which both recognizes and minimizes the risks inherent with the product. Based on our review, the AMN portfolio fails to meet those standards based on" a number of questionable loan practices, including undated or uncompleted credit applications and deviation from credit/reference verification standards. (AMN Ex. 19 at 5.)

Illinois law provides that "an insurer may waive a policy defense by continuing under a policy when it knows, or in the exercise of ordinary diligence, could have known the facts in question giving rise to the defense," *State Farm Mutual Ins. Co.* v. *Gray*, 570 N.E.2d 472, 475 (Ill. App. Ct. 1991), although whether Steadfast exercised due diligence is a fact question not appropriately decided here. The court notes, however, that cases cited by Steadfast are either inapposite or otherwise fail to undermine the proposition that an insurer may waive rights under the policy. While the court in *Nationwide Mutual Ins. Co.* v. *Filos*, 673 N.E.2d 1099, 1103 (Ill. App. Ct. 1996), explained that "Illinois courts have followed the general rule that the doctrine of estoppel cannot be used to create primary liability or to increase coverage under an insurance policy," AMN is not seeking to do either. Instead, AMN

**Should the court accept Steadfast's expert testimony?**

Steadfast requests a finding that 94.8% of defaulted loans did not adhere to the Guidelines, as determined by Steadfast's expert, Baker & Associates. Baker came to this conclusion after auditing all defaulted loans and comparing each application to the Guidelines. Steadfast asks that we accept Baker's conclusions outright and grant summary judgment in its favor. As repeatedly explained above, any Guideline allowing for discretion renders the reasonable application of that Guideline a jury question, and, therefore, the court cannot accept *carte blanche* Baker's testimony regarding those Guidelines. With regard to the Guidelines that are neither ambiguous nor allow for discretionary application, however, the court will not accept Baker's testimony for the reasons set out below.

Initially, the court notes that after briefing on this summary judgment motion had closed, AMN filed a motion to exclude Baker's testimony and, thereafter, obtained two subpoenas *duces tecum* from courts outside this district and served them on Baker and Norwest Bank commanding Baker and Norwest to produce certain documents pertaining to a pending arbitration case unrelated to the litigation presently before this court. In addition, Steadfast has moved to quash these subpoenas, and AMN has now moved to stay its previously filed motion to exclude Baker's testimony. This court has no jurisdiction to quash the subpoenas and, therefore, denies Steadfast's motion to do so. As held in *Lieberman* v. *American Dietetic Assoc.*, No. 94 C 5353,

---

is seeking to stop Steadfast from limiting what it believes is already existing coverage. Further, the *Nationwide* court explained that "[t]he rationale for the general rule is that an insurance company should not be made to pay for a loss for which it has not charged a premium," *id.*, a rationale that Steadfast has not stated applies to this case. *Essex Ins. Co.* v. *Stage 2, Inc.*, 14 F.3d 1178 (7th Cir. 1994), on the other hand, simply shows that under the facts of that case, an insurance company did not waive its right to deny coverage, not that waiver is never possible. Indeed, the Seventh Circuit specifically stated that "[w]aiver may be either express or implied, arising from acts, word , conduct, or knowledge of the insurer" and that waiver is "essentially unilateral, focusing only upon the acts and conduct of the insurer, and requiring no act of the insured to complete it." *Id.* at 1181.

1995 WL 250414 (N.D. Ill. Apr. 25, 1995), this court lacks the power to enforce or modify subpoenas obtained from other district courts. *See also In re Sealed Case*, 141 F.3d 337, 341 (D.C. Cir. 1998) (The language of Federal Rule of Civil Procedure 45 "suggests that only the issuing court has the power to act on its subpoenas. Subpoenas are process of the issuing court, and nothing in the rules even hints that any other court may be given the power to quash or enforce them.") (citations omitted). Additionally, this court will not stay its decision on AMN's motion to exclude. Both these rulings are of no consequence, however, as the court believes that Baker's opinions do not meet the standards enunciated by the Supreme Court for the admission of expert testimony and, as such, grants AMN's motion to exclude this testimony.

A "trial judge has wide discretion in determining both the competency of an expert witness as well as the relevancy of the expert's testimony on a particular subject." *Goodwin* v. *MTD Prods., Inc.*, 232 F.3d 600, 606 (7th Cir. 2000). *Daubert* v. *Merrell Dow Pharm. Inc.*, 509 U.S. 579, 589 (1993), held that a trial court must ensure that scientific expert testimony is relevant and reliable. *See also Bourelle* v. *Crown Equip.*, 220 F.3d 532, 536 (7th Cir. 2000). The Supreme Court in *Daubert* also set forth a "nonexhaustive list of four factors that are helpful in gauging the reliability of expert testimony." *Id.*, 220 F.3d at 536 n.4. In *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137 (1999), the Supreme Court extended its *Daubert* holding to all expert testimony.

*Kumho* is instructive and helps shape the court's inquiry in this case. In *Kumho*, the Supreme Court identified the specific issue before the trial court regarding the proposed expert's testimony as "the reasonableness of using [the expert's] . . . approach, along with [the expert's] particular method of analyzing the data obtained, to draw a conclusion regarding *the particular*

*matter to which the expert testimony was directly relevant.*" (emphasis in original). Stated

another way by the Court, "[t]he trial court had to decide whether this particular expert had

sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case."

*Id.* at 156 (citation and internal quotation mark omitted). Here, the particular matter to which the

expert testimony is directly relevant is whether AMN issued loans to applicants who did not

qualify as a C credit risk. Therefore, the question for the court to decide is whether Baker can

reliably aid the trier of fact in determining whether AMN improperly granted loans. As

explained by the Seventh Circuit, however, this court's "gatekeeping function focuses on an

examination of the expert's methodology. The soundness of the factual underpinnings of the

expert's analysis and the correctness of the expert's conclusions based on that analysis are factual

matters to be determined by the trier of fact, or, where appropriate, on summary judgment."

*Smith* v. *Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). *See also Cooper* v. *Carl A. Nelson*

*& Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000) ("The proper method of attacking evidence that is

admissible but subject to doubt is to cross-examine vigorously, to present contrary evidence, and

to give careful instructions on the burden of proof.").

   The report states that Mr. Baker, President of Baker & Associates, with the assistance of

associates in his organization, reviewed 2,308 defaulted automobile loan claim files that are at

issue in this case to determine whether the loans were granted in compliance with AMN's

underwriting criteria, as well as "to provide an opinion with respect to any significant procedures

related to deviations from prudent industry underwriting practices as known to Virgil Baker &

Associates." (Baker Report at 2.) The report then describes the methods used to evaluate the

files. First, Baker applied certain "pass/fail criteria" and a credit evaluation with assigned point

values which AMN apparently used to initially screen applications based on unverified information.[14]   Second, Baker devised a Worksheet setting out all of the Guidelines that the AMN underwriter was to use in processing a loan application, obtained data from the loan files that would apply to each Guideline, recorded the data, and then tabulated the numbers so as to find the numbers of loans that were issued where the applicant did not meet Grade C criteria. From this method, Baker found that 97.4% passed the basis "pass/fail" screen, 38.8 % met the 45-point minimum criteria, 7.1 % met all the Guidelines, but only 5.2% of the files passed all the tests to be properly funded loans.   Baker then states his opinions (1) that AMN's underwriting criteria were generally in keeping with non-prime lending practices in terms of identifying risk factors; however, "the way in which the Criteria were implemented, with respect to the vast majority of the files reviewed[,] did not follow industry practices," Baker Report at 16; (2) "that his review of the loan files reveals that AMN consistently funded loans that did not meet Grade C criteria; and (3) that AMN failed to properly verify information and failed to bring errors and unauthorized exceptions from the Underwriting Criteria to the attention of the Underwriting Department (presumably this means lack of appropriate supervision of the underwriting staff), which resulted in loans being funded whether or not the underwriting criteria had been met, and this failure deviated from prudent and acceptable industry practice.

At this point it is useful to consider the order and burden of proof.   Steadfast has the

---

[14]Here the court notes that some "screening" criteria in addition to the criteria discussed in the body of the opinion above seem to have been part of Baker's evaluation, including whether the application was incomplete, whether the vehicle being purchased had more than 90,000 miles on the odometer report, and whether the vehicle was intended for commercial use, each of which would have been cause for denial of the loan. (Baker Report at 4-5.)  In addition, Baker refers to a point-based "credit underwriting evaluation" which requires that values assigned to residential stability, employment and credit history must total at least 45, and if less than 45, the contract is "not acceptable." (*Id.* Ex. A at p. 003169.)  AMN does not dispute the existence of these additional criteria, so the court assumes that it was proper for Baker to consider them.

burden to prove that AMN in applying the criteria did not apply the Guidelines, and where the meaning of terms becomes an issue as to whether a guideline was applied, to prove that a reasonable application of the term resulted in non-compliance with a guideline. Obviously, Steadfast needs a witness who can put on the proof, and an experienced underwriter such as Mr. Baker is not an inappropriate choice.[15]

In keeping with Steadfast's position that none of the Guidelines was ambiguous, Baker purports to have simply performed a mechanical task of data collection. If that is what he did, Baker is qualified to testify as to the calculations he made, just as any witness who prepared a summary based on voluminous data might testify, but this testimony does not require use of Baker's expertise in sub-prime lending practices. As the Seventh Circuit noted in a case cited by Steadfast, "[e]ven if it is clear that the field in general qualifies for expert testimony, the proffered testimony may or may not be based upon the expert's special skills." *United States* v. *Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996). The court further explained in *Hall* that

> . . . the district court is not compelled to exclude all expert testimony that may in some way overlap with matters within the jury's experience. The test of Rule 702 is whether the testimony will assist the jury. If it meets that test, the district court may still use the normal controls on scope of testimony and relevance that are available to it. If the proffered testimony duplicates the jury's knowledge, Rule 403 might counsel exclusion of the expert testimony to avoid the risk of unduly influencing the jury. Or the court might conclude that certain matters go beyond the individual's expertise.

*Id.* at 1344. Yet, it is readily apparent, as AMN points out, that in applying the Guidelines, Baker

---

[15]AMN complains Baker kept no records or notes of the input data (other than the worksheets and loan files) making it impossible for AMN to verify the accuracy of his conclusions, complaining that one would have to simply redo the analysis in order to test it. This, by itself, is not a valid complaint. AMN must either discredit the witness's data and conclusions on cross examination or rebut the testimony with its own analysis of the data. At the summary judgment stage, the movant's proof is normally accepted unless rebutted by at least some evidence to the contrary (e.g., AMN's own analysis of the data).

did in fact put himself in the position of an underwriter at times and necessarily made judgment calls about the files.[16] If this is what he did, then he might testify that as an expert underwriter looking at a particular file, he would have concluded "Grant" or "Deny." In this event, he appears to have the requisite knowledge of industry practice to be able to inform a jury as to the reasonable application of discretionary terms. But since Baker does not purport to have done that, indeed the report does not purport to proffer him as an expert in this sense, the court will not accept the Baker report as conclusive, even though unrebutted.

Having reached this conclusion, the court will address its own concern and some of the concerns raised by AMN as to the reliability of the data on which Mr. Baker would rely should he testify. As discussed in the body of this opinion, the parties have framed the dispositive issue as whether AMN failed to apply particular, agreed-to criteria in funding loans. But because some of the terms in the criteria are imprecise, and even Steadfast did not define the terms, Baker can only testify as to what he would have done with each of the applications using AMN's guidelines as he interpreted the terms. Because this court has denied summary judgment as to what some of the Guidelines mean, it is impossible to conclude that Mr. Baker's methodology generated reliable data and conclusions. Thus the premises on which Baker purports to testify must be clarified in order to be probative of facts in issue. The court recommends that the parties work together to analyze the data in light of the opinions expressed herein so that, if the case goes to

---

[16]In addition to the necessity for use of discretion identified in the body of this opinion, Baker refers numerous times to judgments made that are not explicit in the underwriting criteria. For example, he refers to whether an application was "reasonably completed" (Baker Report at 4); if an odometer statement was missing, he used other documents to ascertain the information (*id.*); he used various pieces of information to determine whether a vehicle would "probably be" for personal use (*id.* at 5); he followed the point-based scoring matrix "in the same way as the AMN Underwriter would have" (*id.* at 5); he ignored "the instructions on the form to only award bonus for those applications which scored less than 40 points for items 1, 2, and 3 on the Matrix" (*id.* at 6); and to verify employment history, he relied on "source documents [which] collectively provided enough information so as to enable one to make a series of telephone calls and verify . . . " (*id.* at 8).

trial, the jury will be presented with narrowly defined disputes of fact, or more likely, the parties

can determine which loans were non-complying and resolve this case without a trial.

The court directs the parties to meet and discuss the ruling and be prepared to inform the

court at the next status hearing of the best path to a just, speedy and inexpensive resolution of the

case.

## CONCLUSION

For the above-stated reasons, the court denies Steadfast's motion for partial summary

judgment [#129], but narrows the triable issues as detailed above. Moreover, the court denies

Steadfast's motion to quash [#181], denies AMN's motion to stay [#187], and grants AMN's

motion to exclude the presently proffered testimony of Virgil Baker [#155]. This matter is set for

status on August 30, 2001, at 9:30 a.m.

Date: July 31, 2001                    Enter: *Joan H. Lefkow*
                                              JOAN HUMPHREY LEFKOW
                                              United States District Judge