# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 5696 | **DATE** | 10/27/2003 |
| **CASE TITLE** | Steadfast Insurance Company vs. Auto Marketing Network, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Motion of Imperial Credit Industries, Inc. for a new trial on its counterclaim[294-1] is granted. Ruling on Imperial's attempted disqualification of the law firm of O'Melveny & Myers is reserved pending an evidentiary hearing. Status hearing is set for 11/10/03 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 5 | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | OCT 2 8 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 324 |
| | Copy to judge/magistrate judge. | | 10/27/2003 | |
| | | | date mailed notice | |
| MD | courtroom deputy's initials | Date/time received in central Clerk's Office | MD mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| STEADFAST INSURANCE COMPANY, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> AUTO MARKETING NETWORK, INC. and ) <br> IMPERIAL CREDIT INDUSTRIES, INC., ) <br> ) <br> Defendants. ) <br> ) | No. 97 C 5696 <br> Judge Joan H. Lefkow |

**DOCKETED**
**OCT 2 8 2003**

## MEMORANDUM OPINION AND ORDER

On April 15, 2003, following a two-week trial, a jury returned a verdict (1) in favor of defendant Auto Marketing Network, Inc. ("AMN") on a breach of contract claim brought by plaintiff, Steadfast Insurance Company ("Steadfast"), and (2) in favor of Steadfast on a counterclaim brought by defendant/counter-plaintiff Imperial Credit Industries, Inc. ("Imperial") alleging bad faith insurance litigation under 720 ILCS 5/46-5(b).[1] Pending before the court is Imperial's motion for a new trial under Federal Rule of Civil Procedure 59.

Imperial believes a new trial is warranted for three reasons. First, Imperial argues that it should be afforded a new trial because of this court's ruling excluding Imperial's expert witnesses, which Imperial believes was a clear error of law. *See Steadfast Ins. Co. v. Auto Mktg. Network Inc.*, No. 97 C 5696, 2001 WL 881324, at *9 (N.D. Ill. Aug. 2, 2001). Second, Imperial argues the jury's verdict was against the weight of the evidence. Finally, it asserts that a conflict

---

[1] The court previously entered judgment as a matter of law on Steadfast's claims for fraud against AMN and for alter ego liability against Imperial. (*See* docket entry #286.)

324

of interest existed because Steadfast secretly retained during the trial the law firm of O'Melveny & Myers ("O'Melveny"), which formerly represented Imperial, and that this conflict which did not become known to Imperial until after the trial necessitates a new trial. For the reasons stated below, the court grants a new trial based on the first issue and thus does not address the second and third grounds for new trial. The issue remains, however, whether Steadfast's retention of O'Melveny created a conflict of interest with Imperial, that is, whether Imperial's confidences might have been disclosed to Steadfast's counsel, and what consequences should follow going forward. On this issue, an evidentiary hearing is required.

## I. Exclusion of Imperial's Expert Witnesses

Imperial believes it should be granted a new trial because of this court's exclusion of two expert witnesses, Professor Stephen Lubet ("Lubet") and Mr. Stephen Diamond ("Diamond"). With great reluctance, the court agrees. Rule 59 affords trial courts broad discretion in determining the propriety of a new trial, *Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1377 (7th Cir. 1990), although "it is always an abuse of discretion to base a decision on an incorrect view of the law." *United States v. Mietus*, 237 F.3d 866, 870 (7th Cir. 2001). "The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice." 11 Wright, Miller & Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2805 (1995) (citing cases). A new trial may be granted if in the court's discretion the previous trial was "unfair to the moving party." *See Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1196 (7th Cir. 1993). Both Lubet and Diamond are attorneys, and Imperial wished to call them to testify regarding the duties and obligations imposed on lawyers in investigating a potential claim and filing a law suit and to opine whether Steadfast filed its

Steadfast filed its complaint in bad faith. The court previously granted Steadfast's motion to exclude the testimony on the basis that "Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case. That is, they cannot testify about legal issues on which the judge will instruct the jury." *United States* v. *Sinclair*, 74 F.3d 753, 758 n.1 (7th Cir. 1996) (citing *Bammerlin* v. *Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994) and *Harbor Ins. Co.* v. *Continential Bank Corp.*, 922 F.2d 357, 366 (7th Cir. 1990)). Therefore, the court held that it would instruct the jury on Steadfast's duty of reasonable investigation and the jury would assess how well Steadfast measured up to that standard. *See Steadfast*, 2001 WL 881324, at *9.

Imperial views the court's ruling as prejudicial error for two reasons. First, Imperial reasons that its experts would have testified on subjects where expert testimony is both permissible and necessary, including how a lawyer conducts a prefiling investigation in compliance with applicable rules and how an investigation leads to the drafting and filing of a complaint. Imperial also argues that the experts' opinions that Steadfast's conduct rose to a level of bad faith would not have invaded the province of the court as the ultimate arbiter of law because the court previously defined the term "bad faith" within the meaning of the Illinois Insurance Fraud Statute.

First, the court agrees with Imperial's claim that the expert testimony was necessary to explain Steadfast's obligations regarding prefiling investigations and the actual filing of the Complaint. As Imperial points out, the obligations a lawyer has regarding a prefiling investigation and the filing of a law suit are governed by several Federal Rules of Civil Procedure, including Rules 4, 8 and 11. This is an appropriate area for which expert testimony is

3

both necessary and useful as a layperson has no basis for knowledge of the federal rules and has no way of knowing whether a lawyer has properly investigated and/or filed a complaint. Indeed, in the legal malpractice context, such expert testimony is actually required in most instances. *See, e.g., Barth v. Reagan*, 139 Ill. 2d 399, 406, 564 N.E.2d 1196, 1200 (1990) ("Failure to present expert testimony is usually fatal to a plaintiff's legal malpractice claim."); *Peaceful Family Ltd. P'ship v. Van Hedge Fund Advisors, Inc.*, No. 98 C 1539, 2000 WL 1644315, at *2 (N.D. Ill. Oct. 26, 2000) ("The general rule in Illinois law is that expert testimony is required in legal malpractice cases to establish the standard of care and defendant's breach of that standard."). While Steadfast correctly points out that this is not, in fact, a legal malpractice case in which the standard of care is at issue, nevertheless, the case does involve how Steadfast conducted itself in investigating and bringing this suit against Imperial. For the jury to be able to properly analyze Steadfast's actions, it was certainly relevant how Steadfast's conduct measured up against the obligations imposed under the federal rules.

Second, the court agrees with Imperial as to the inherent unfairness the ruling imposed on the presentation of its case. Because Imperial could not bring forth this evidence from their expert witnesses, and because such evidence needed to be presented to the jury in some form, the only other source of this evidence was Stephen Bauer ("Bauer"), Steadfast's in-house lawyer. It simply was not fair to force Imperial to bring forth evidence concerning the applicable federal rules and how a lawyer investigates and prepares for the filing of a complaint from a fact witness that was adverse to it. This testimony allowed Bauer to offer at least one opinion regarding the Federal Rules of Civil Procedure and to testify about Steadfast's investigation preceding the filing of the original Complaint. The court also agrees with Imperial that because it could not

4

bring this testimony out through its experts and was required to use Bauer to place this evidence before the jury, Steadfast was provided an inappropriate factual basis to argue (1) that the Complaint set forth sufficient factual allegations against Imperial (a ruling this court has already specifically rejected, *see Steadfast*, 2001 WL 881324, at *8) and (2) that the Complaint was otherwise sufficient. In addition, based on Bauer's testimony, during closing arguments Steadfast's counsel was able to frame the issue as boiling down to Imperial's ownership of AMN and whether Imperial "ever read" the Complaint, which Imperial correctly notes was not how the court previously framed the issue or instructed the jury. The expert testimony would have properly served to rebut both Bauer's testimony and these arguments Steadfast introduced during closing arguments.

A third matter, which may be better reserved for resolution at a new trial, is whether Imperial's experts may opine that Steadfast's actions were not in good faith, or in bad faith, as opposed to merely testifying as to what a good faith investigation would entail. If the analogy to a malpractice action applies, the expert witnesses could testify as to the ultimate issue. At the very least, their expertise would have provided guidance to the jury, without which Imperial was forced to use as its star witness one of the individuals implicated in the alleged bad faith. With no evidence to contrary, Imperial's case was manifestly prejudiced.

With the benefit of hindsight, the court believes the exclusion of Imperial's witnesses resulted in manifest injustice to Imperial. Despite the obvious expense and delay involved, the court will grant Imperial's motion for a new trial on its counterclaim.

## II.  Conflict of Interest

During discovery, pre-trial motion practice and at trial, Steadfast was represented by the law firm of Schulte, Roth and Zabel, LLP ("SRZ"), with Mr. Howard Epstein ("Epstein") serving as lead counsel. Imperial and AMN were both represented by the law firm of Powell, Goldstein, Frazer & Murphy, LLP, with Mr. Allen Rugg ("Rugg") serving as lead counsel. Trial in this case began on March 31, 2003. Unbeknownst to both the court and counsel for Imperial, on or about that date Steadfast hired Mr. Michael Yoder ("Yoder"), a partner at O'Melveny, to provide legal advice with respect to this case. Yoder did not file a formal appearance or take part in the trial activities in court, but instead observed the trial from the back of the courtroom. According to Rugg, who at this time did not know who Yoder was or why he was in the courtroom, Yoder wrote extensive notes during the trial, and at recesses entered the attorney witness room adjacent to the courtroom with Steadfast's team of lawyers, including those from SRZ. (Rugg decl. ¶ 4.) Rugg also observed Yoder meeting with Steadfast's attorneys in the corridor of the courthouse during recesses. (*Id.*)

On May 1, 2003, Imperial filed its motion for a new trial on its counterclaim. Thereafter, on May 6, Epstein called Rugg and introduced him to Yoder. Epstein stated that Yoder intended to file an appearance for Steadfast in the case and that SRZ intended to withdraw their own appearance. (Rugg decl. ¶ 5.) At this time Yoder confirmed to Rugg that he had observed the trial on Steadfast's behalf. (*Id.*) On May 8, Rugg requested that Yoder confirm when O'Melveny began its representation and provide the factual and legal support for the conclusion that O'Melveny was free to represent Steadfast. (*Id.*) Rugg's reason for requesting this confirmation from Yoder stemmed from Imperial's previous retention of O'Melveny. Beginning

6

on March 19, 2002, Imperial had retained Mr. Ben Logan ("Logan"), a partner at O'Melveny, to advise Imperial as to the possible restructuring of the company and to negotiate with its creditors. O'Melveny advised Imperial as to restructuring alternatives, preparation of a bankruptcy plan of reorganization, and negotiations with Imperial's creditors. Over several months, O'Melveny billed Imperial $244,342.89 with 20 individual timekeepers working on the matter. (Rubens decl. at ¶ 4, Ex. 1.) Imperial terminated O'Melveny's services on June 7, 2002.

During the time that O'Melveny was engaged as counsel for Imperial, this case was scheduled for trial on June 10, 2002. In the parties' joint final pretrial statement filed with the court on April 29, 2002, Steadfast claimed damages of more than $37 million and Imperial asserted counterclaim damages in twice that amount.[2] On May 1, 2002, in anticipation of the June trial, Rugg presented a report to Imperial's board of directors at Imperial's headquarters in Torrance, California. Rugg provided what he refers to as a candid analysis of this case, including trial strategies and settlement negotiation recommendations. (Rugg. decl. ¶¶ 14-15.)

While there is no dispute that Logan attended parts of the May 1 meeting, the parties disagree as to whether he was in attendance when Rugg gave his confidential presentation concerning Imperial's trial plans and strategies. According to Imperial, Logan was present when Rugg made the confidential presentation. (*See* Miller decl. ¶¶ 9-10; Maloney decl. ¶¶ 9-10.)[3] Conversely, O'Melveny maintains that Logan did attend a portion of the meeting but did not attend that portion during which the presentation was made. (Logan decl. ¶ 11; Gubman decl.

---

[2]This litigation was reported in Imperial's annual and quarterly filings with the Securities and Exchange Commission. O'Melveny reviewed both Imperial's 2001 Forms 10-K and 10-Q for the first quarter of 2002 as part of its restructuring and bankruptcy preparations.

[3]Louis R. Miller was in attendance at the meeting as legal counsel to the outside directors of Imperial. Theodore R. Maloney was in attendance because he was a member of Imperial's board of directors.

7

¶¶ 7-8.) Logan also declares that he never gained access to any confidential matters regarding the Steadfast litigation during his representation of Imperial. (Logan decl. ¶ 2-3.) Irwin Gubman, Imperial's former General Counsel and Secretary, concurs and states that he supervised both Logan's restructuring work and the work being done in preparation for the Steadfast litigation, and that no confidential information concerning the Steadfast litigation was shared with anyone at O'Melveny. (Gubman decl. ¶ 5.)

After Rugg questioned Yoder about O'Melveny's representation of Steadfast, Yoder assured Rugg that an O'Melveny partner other than Logan or Yoder would conduct an investigation and respond to Imperial's objections. (Rugg decl. Ex. 4D.) Thereafter, Mr. James W. Colbert ("Colbert") contacted Rugg by letter. (Rugg decl. ex. 4F.) Colbert acknowledged that Logan learned about the Steadfast case through his representation of Imperial. (*Id.*) However, he concluded that the two matters involved are not substantially related and that no confidential information had been disclosed to O'Melveny. (*Id.*) He also advised Rugg that screening procedures were instituted in May 2003 to prevent the disclosure of confidential information. (*Id.*)

Imperial argues that O'Melveny's representation of Steadfast contravenes this District's Local Rules. Local Rule 83.51.9(a) states that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which the person's interests are materially adverse to the interests of the former client unless the former client consents after disclosure." This prohibition is broadened by Local Rule 83.51.10(a), which states that "[n]o lawyer associated with a firm shall represent a client when the lawyer knows or reasonably should know that another lawyer associated with that firm would

8

be prohibited from doing so by . . . LR 83.51.9." There is no dispute that Logan previously represented Imperial, and that both Logan and Yoder work for O'Melveny. Therefore, the issue in this case turns on whether Logan's representation of Imperial is "substantially related" to this litigation.

An analysis under the substantial relationship test "turns on the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the subsequent matter in which disqualification is sought." *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 224 (7th Cir. 1978). Significantly, the court is not to inquire into whether confidences were actually disclosed. *E.g., id.*, 588 F.2d at 224 ("[I]t is not appropriate for the court to inquire into whether actual confidences were disclosed."); *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1266 (7th Cir. 1983) (noting that it is "irrelevant whether [the attorney] actually obtained such [confidential] information and used it against client."); *Donohoe v. Consolidated Operating & Prod. Corp.*, 691 F. Supp. 109, 112 (N.D. Ill. 1988) ("[B]ecause a client has the right to preserve his or her confidences, and because that right would be lost if the client had to reveal the confidences to prove any link in that chain, courts do not demand proof of actual flow of information."). The "substantially related" test instead focuses on whether a lawyer "*could* have obtained confidential information in the first representation that would have been relevant in the second." *Analytica*, 708 F.2d at 1266 (emphasis added). Three levels of inquiry must be examined in determining whether confidential information could have been disclosed so as to warrant disqualification.

> Initially, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given

9

to a lawyer representing a client in those matters. Finally, it must be determined
whether that information is relevant to the issues raised in the litigation pending
against the former client.

*Westinghouse*, 588 F.2d at 225. "Relevance must be gauged by the violations alleged in the complaint and assessment of the evidence useful in establishing those allegations." *Id.* at 226.

Applying the first prong of the test, the court looks to an affidavit Logan filed, which Imperial does not challenge factually, for the scope of O'Melveny's prior legal representation of Imperial. Logan described his representation as follows:

> 5. [Imperial], the holding company parent, had issued approximately $175 million of various notes and debentures. This capital structure was extremely complicated. For example, there were six different series of notes and debentures involved, some of which had liens on the stock of [Southern Pacific Bank ("SPB"), a subsidiary of Imperial which was subject to oversight by the Federal Deposit Insurance Corporation ("FDIC") and was required by the FDIC to enhance its regulatory capital or risk seizure], while others were general unsecured obligations of [Imperial]. One of these issues of debentures, the Resettable Rate Debentures, Series A (the "ROPES"), was subject to a mandatory payment on June 14, 2002 and was held by a number of parties that were adverse to [Imperial] and litigious. The two senior-most series of notes, each secured by [Imperial's] stock in SPB, had a maturity date of June 28, 2002, that was potentially extendable to July 15, 2002 if certain conditions were met. Most of our work consisted of attempting to analyze the various rights of these notes and debenture holders relative to each other and against [Imperial], and to work with [Imperial] in developing, and then negotiating with the note and debenture holders, a plan or reorganization for [Imperial].
> 6. That reorganization of [Imperial] needed to be coordinated with the capital enhancement plan for SPB. SPB and [Imperial] at the time were exploring, through other advisers and counsel, a capital enhancement plan that could include selling equity in SPB or, perhaps, transferring various assets from [Imperial] and its other subsidiaries to SPB. I was advised that the FDIC and state regulators would ascribe value, for regulatory capital purposes, only to cash and other clearly recognizable assets. Litigation claims would not qualify for regulatory purposes so the Steadfast Litigation was irrelevant to this analysis.

7. Extremely complex tax issues further complicated development of a possible plan or reorganization. These included potential claims the IRS might have against [Imperial], SPB and its entire family of companies, plus preservation, to the maximum extent possible, of certain tax benefits, related to prior year net operating losses, of the [Imperial] family of companies.

8. The Steadfast Litigation was simply not relevant to any of this. Our restructuring work focused on negotiations with [Imperial's] noteholders and debenture holders, including a fair and equitable allocation of whatever value would remain in [Imperial] after a recapitalization of SPB. That allocation depended upon the relative amounts and legal priorities of the notes and debentures of [Imperial] vis-a-vis each other. With the exception of the value of SPB, this allocation (and therefore the restructuring) did not depend on the value of any of [Imperial's] miscellaneous other assets, including this litigation claim with Steadfast. (The only reason that the value of SPB entered into this calculus was that certain of the note and debenture holders had liens on the stock of SPB, while others did not.)

9. In the course of the work for [Imperial], I prepared a term sheet for a possible plan of reorganization for [Imperial]. . . . For the reasons I explained above, this term sheet delves into such issues as the relative priorities of the various notes and debentures, coordination between an [Imperial] plan of reorganization and the proposed recapitalization of SPB, various complex tax issues and also certain securities law and regulatory issues that should be considered in such a plan of reorganization. There is no mention, however, of the Steadfast litigation, because it simply was not relevant. The bankruptcy restructuring only needed to focus on the fair allocation of ownership in [Imperial] among the various noteholders and debenture holders, i.e., the relative percentage ownership among the note and debenture holders in reorganized [Imperial]. The value of [Imperial] as reorganized would depend upon a number of imponderables, including the value of the SPB stock to be retained by [Imperial], the value of various other assets, and the like. But (except for the value of the SPB stock) the bankruptcy restructuring plan did not turn on whatever value might be available from these assets, including possible litigation claims.

(Logan decl. ¶¶ 5-9.)

As to the second prong, it is reasonable to infer that O'Melveny was given confidential information in the course of representing Imperial, particularly with respect to the rights of the holders of $175 million in notes and debentures and the tax and regulatory issues Logan

analyzed. Thus, it is "appropriate to presume that confidential information has passed in the prior relationship . . . ." *Pacific Dunlop Holdings, Inc. v. Barosh*, No. 91 C 2, 91 C 25, 1992 WL 168535, at *9 (N.D. Ill. July 14, 1992) (quoting *Bridge Prods., Inc. v. Quantum Chem. Corp.*, No. 88 C 10734, 1990 WL 70857, at *5 (N.D. Ill. April 27, 1990)).

This case, therefore, turns on the third prong, whether information Logan gained during his representation of Imperial is relevant to issues raised in this litigation. Imperial argues that confidential information about the Steadfast litigation could have been divulged to Logan because he was offering restructuring advice and preparing a bankruptcy filing that would have been affected by whatever happened in this litigation. Imperial believes that such confidential information could have included particular trial strategies, Imperial's chances for settlement and the monetary ranges within which it would settle. To illustrate how these confidences may have been disclosed, Imperial states that a settlement or judgment on its counterclaim prior to trial could have enabled Imperial to cure many of its defaults and negotiate repayment dates on more favorable terms. On the other hand, Imperial reasons that if Steadfast were to have prevailed, an adverse judgment would have had the opposite effect on Imperial's relations with note and debenture holders.

Of course, the Steadfast litigation's merely having an effect on Logan's work is insufficient to show a substantial relation, as litigation on this scale was likely to affect all aspects of Imperial's operations. Instead, the measure here is whether O'Melveny through Logan could have obtained confidential information relevant to the Steadfast litigation. Simply because the nature of Logan's work would likely have significantly changed depending on the result of this litigation does not establish that the two matters are substantially related. Indeed, the

confidences Logan was sure to have obtained concerning the notes and debentures and the related tax and regulatory issues are completely irrelevant to the claim of bad faith insurance litigation Imperial brought against Steadfast. *Cf. Westinghouse*, 588 F.2d at 225-27 (information gained by former counsel relating to the quantity and quality of uranium reserves was relevant to antitrust action filed alleging conspiracy to restrict uranium production); *Analytica*, 708 F.2d at 1267 (former counsel who represented client in a transaction gained information concerning profitability, sales prospects, and general market strength, which were "germane" to both the liability and damages phases of later filed antitrust suit charging monopolization). Imperial retained O'Melveny to offer advice on proposed financial restructuring including a possible Chapter 11 plan of reorganization. This case deals with bad faith insurance litigation. There is no substantial relationship between the two matters to warrant disqualification.

The court must also address, however, the parties' conflicting views concerning the presentation Rugg made to Imperial's board of directors and whether Logan was in attendance at that portion of the meeting. There is no dispute that confidential information was presented at that meeting and, if Logan was present during this presentation, he would have been privy to confidences about this litigation. Imperial presents affidavits from two persons who attended the meeting who aver that Logan was present when Rugg made the confidential presentation. (Miller decl. ¶¶ 9-10; Maloney decl. ¶¶ 9-10.) In response, O'Melveny presents evidence that Logan only attended parts of this meeting and that he was not present when the confidential information was disclosed. This evidence is supplied in affidavit form by Logan (*see* decl. ¶ 11) and Gubman (*see* decl. ¶¶ 7-8.) There is also evidence from Logan's handwritten notes that he should plan on arriving for the meeting no later than noon so that he would not be present for

13

portions of the meeting that dealt with an audit committee (scheduled from 10:30 to 11:00) and the Steadfast litigation. Needless to say, based on the conflicting evidence presented the court is not in a position to decide this issue without an evidentiary hearing where findings of fact may be made. Thus, if Imperial wishes to continue to assert that O'Melveny should be disqualified, the court will hold an evidentiary hearing to decide this issue.

## CONCLUSION

For the reasons stated above, Imperial's motion for a new trial on its counterclaim is granted [#294]. However, regarding Imperial's attempted disqualification of the law firm of O'Melveny & Myers, ruling is reserved pending an evidentiary hearing. This case will be called for status on November 10, 2003 at 9:30 a.m.

Enter: *[signature]*
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: October 27, 2003